COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Clements and Senior Judge Coleman
Argued at Richmond, Virginia


VOLKSWAGEN OF AMERICA, INC.
                                        OPINION BY
v.   Record No. 1947-01-2      JUDGE JEAN HARRISON CLEMENTS
                                      SEPTEMBER 17, 2002
ASBURY W. QUILLIAN, COMMISSIONER
 OF THE VIRGINIA DEPARTMENT OF
 MOTOR VEHICLES AND
 MILLER AUTO SALES, INC.


           FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                    Melvin R. Hughes, Jr., Judge

           James R. Vogler, pro hac vice (Randall L.
           Oyler; Steven J. Yatvin; Douglas M. Palais;
           Brian L. Buniva; Patricia A. Collins; Barack
           Ferrazzano Kirschbaum Perlman & Nagelberg;
           McCandlish Kaine, P.C, on briefs), for
           appellant.

           Richard L. Walton, Jr., Senior Assistant
           Attorney General (Randolph A. Beales,
           Attorney General; Richard B. Campbell, Deputy
           Attorney General, on brief) for appellee
           Asbury W. Quillian, Commissioner of the
           Department of Motor Vehicles.

           Brad D. Weiss (C. Michael Deese; Michael C.
           Gartner; Charapp, Deise & Weiss, LLP, on
           brief), for appellee Miller Auto Sales, Inc.


     This appeal arises from a decree of the Circuit Court of the

City of Richmond (circuit court) affirming the ruling by Richard

D. Holcomb, former Commissioner of the Virginia Department of

Motor Vehicles (commissioner), that the method used by Volkswagen

of America, Inc. (Volkswagen) to allocate its newly manufactured

motor vehicles to Miller Auto Sales, Inc. (Miller) was in

violation of Code § 46.2-1569(7), and finding that the commissioner exceeded his authority in requiring Volkswagen, in remedy of that violation, to implement a new method of vehicle allocation that complied with Code § 46.2-1569(7). On appeal, Volkswagen challenges the circuit court's affirmance of the commissioner's determination that Volkswagen violated Code § 46.2-1569(7), contending the circuit court erred in rejecting Volkswagen's claims that (1) Code § 46.2-1569(7) is unconstitutionally vague, (2) Code § 46.2-1569(7) violates the Commerce Clause of the United States Constitution, (3) the commissioner's determination exceeded the scope of his authority under Code § 46.2-1569(7) because it was based on Volkswagen's method of vehicle allocation rather than the specific numbers of vehicles allocated by Volkswagen; and (4) the commissioner failed to provide Volkswagen adequate procedural protections and wrongfully placed the burden of proving compliance with Code § 46.2-1569(7) on Volkswagen. On cross-appeal, Miller contends the circuit court erred in ruling that the remedy imposed by the commissioner exceeded the commissioner's statutory authority. In addition, the commissioner challenges the jurisdiction of this Court to decide this appeal, contending in his motion to dismiss that the decree appealed from was not a final decision of the circuit court, as required by Code § 17.1-405.

For the reasons that follow, we deny the commissioner's motion to dismiss the appeal as to the commissioner's determination that Volkswagen violated Code § 46.2-1569(7) and grant it as to the unresolved issue of what remedy the commissioner may impose. Accordingly, we dismiss Miller's

- 2 -

cross-appeal regarding the issue of remedy. Additionally, we affirm the circuit court's judgment that the commissioner correctly determined that Volkswagen violated Code § 46.2-1569(7).

## I. BACKGROUND

The record reveals that, on February 9, 1998, Miller, a retail dealer of Volkswagen-brand motor vehicles in Winchester, Virginia, filed a complaint with the Department of Motor Vehicles challenging Volkswagen's allocation of newly manufactured vehicles. Miller maintained that Volkswagen's allocation of vehicles violated Code § 46.2-1569(7)[1] to Miller's detriment.

---

[1] Code § 46.2-1569(7) provides:

> Notwithstanding the terms of any franchise agreement, it shall be unlawful for any manufacturer, factory branch, distributor, or distributor branch, or any field representative, officer, agent, or their representatives:
>
> *      *      *      *      *      *      *
>
> 7. To fail to ship monthly to any dealer, if ordered by the dealer, the number of new vehicles of each make, series, and model needed by the dealer to receive a percentage of total new vehicle sales of each make, series, and model equitably related to the total new vehicle production or importation currently being achieved nationally by each make, series, and model covered under the franchise. Upon the written request of any dealer holding its sales or sales and service franchise, the manufacturer or distributor shall disclose to the dealer in writing the basis upon which new motor vehicles are allocated, scheduled, and delivered to the dealers of the same line-make. In the event that allocation is at issue in a request for a hearing, the dealer may demand the

- 3 -

Following the appointment of a hearing officer to preside over the proceedings on Miller's complaint, Volkswagen, the distributor of Volkswagen-brand motor vehicles in the United States and Canada, filed a motion to dismiss the proceedings on constitutional grounds. The hearing officer overruled the motion and subsequently conducted a formal evidentiary hearing on Volkswagen's alleged failure to provide to Miller an equitable number of vehicles in violation of Code § 46.2-1569(7). The hearing officer received factual and expert evidence, much of which focused on Volkswagen's vehicle allocation system and methodology rather than on the actual number of vehicles shipped by Volkswagen to Miller.

Following the hearing, the hearing officer issued a proposed decision dated May 25, 1999. In that decision, the hearing officer stated that, throughout the period of time covered by Miller's complaint, starting in 1997, Volkswagen's vehicle allocation system was based on a mathematical formula that calculated the allocation of new vehicles to the dealers in Miller's sales area on the basis of the inventory of those dealers and their anticipated and actual vehicle sales. The hearing officer found that, while equitably "designed with the logic that vehicles should be allocated where they were likely to be sold [and] where they were needed because of low inventory,"

Commissioner to direct that the manufacturer or distributor provide to the dealer, within thirty days of such demand, all records of sales and all records of distribution of all motor vehicles to the same line-make dealers who compete with the dealer requesting the hearing.

- 4 -

Volkswagen's allocation formula unfairly penalized small-volume dealers like Miller in practice. The hearing officer stated that, because it truncated, i.e., rounded down, fractional vehicle allocations and did not allow fractional vehicle allocations to accumulate, the allocation formula used by Volkswagen effectively prevented Miller, which was the smallest-volume dealer in its sales area, from acquiring vehicles in short supply, such as the newly released Passat and Beetle models.

The hearing officer also observed that the inequities in the allocation formula were compounded by Volkswagen's adoption of the practice of adjusting vehicle allocations to its dealers based on customer satisfaction survey scores. That practice, the hearing officer found, inequitably punished Miller, "whose scores were generally lower than those of other dealers in Miller's [sales] area." The hearing officer stated that "one could reasonably conclude from some of the statistical evidence presented . . . that the restriction of allocations itself created a vicious cycle of lower [customer satisfaction] scores, as customers who were delayed in receiving ordered vehicles, or who could not get vehicles precisely as specified, might well be less satisfied with Miller." The hearing officer added that Volkswagen's "own witnesses seemed to recognize that [the practice of using customer satisfaction scores as a basis of allocating vehicles] was punitive and inequitable." Accordingly, the hearing officer found that Volkswagen failed to "show that utilization of [customer satisfaction scores] as a governor on the allocation system was fair and equitable."

The hearing officer also found that Volkswagen failed to show that its purported policy of overriding the allocation formula to assure that each dealer had at least one vehicle in stock of each model was adequate to remedy the inequities in the allocation methodology and make it compliant with Code § 46.2-1569(7). The hearing officer added that, despite Volkswagen's testimony that this policy was a "hallowed and long-standing 'unwritten rule' for allocation," it appeared to be a rule that was honored in this case only after Miller requested a hearing before the Department of Motor Vehicles.

Finding Volkswagen's allocation methodology "flawed in its design and deficient in its operation," the hearing officer concluded that Volkswagen was in violation of Code § 46.2-1569(7) and recommended, inter alia, that the commissioner require Volkswagen to replace its vehicle allocation methodology with a new, compliant one and prohibit Volkswagen from "utilizing allocations or vehicle supply as an incentive or disincentive in support of any [Volkswagen] program, unless explicitly permitted under [an] . . . approved Franchise Agreement."

On July 12, 1999, the commissioner issued a "Hearing Decision," adopting the hearing officer's findings and most of his recommendations. The commissioner concluded that Volkswagen's "allocation methodology [did] not conform to and [was] in violation of Code § 46.2-1569(7)." The commissioner ordered Volkswagen to replace its "current vehicle allocation methodology with a new methodology that complies with the provisions of . . . Code § 46.2-1569(7)" and prohibited Volkswagen from "utilizing allocations or vehicle supply as an

- 6 -

incentive or disincentive in support of any [Volkswagen] program, unless explicitly permitted under a[n] . . . approved Franchise Agreement."

Volkswagen appealed the commissioner's decision to the circuit court, contending that the commissioner erred in finding Volkswagen had violated Code § 46.2-1569(7) and that the commissioner lacked the authority to order Volkswagen to change its allocation system. In its letter opinion dated March 15, 2001, the circuit court concluded that the commissioner's determination that Volkswagen's vehicle allocation system violated Code § 46.2-1569(7) was consistent with law and supported by the record. The court also determined, however, that the commissioner exceeded his authority in ordering Volkswagen to adopt a new vehicle allocation system because such a remedy was not expressly authorized by the motor vehicle code. The only remedies available to the commissioner in this case, the court observed, were to declare Volkswagen in violation of the statute and to revoke Volkswagen's license to do business in Virginia.

The circuit court entered a "Final Decree and Order of Dismissal" on June 29, 2001. In that decree, which incorporated the court's letter opinion, the court concluded that there was "a sufficient basis in the administrative record to support the . . . [c]ommissioner's determination that [Volkswagen's] vehicle allocation system in effect at the time of the proceedings below violated . . . Code § 46.2-1569(7)." The court also concluded that "the [c]ommissioner exceeded his statutory authority with respect to the remedies imposed and the relief granted against

[Volkswagen]."  Accordingly, the court, acting pursuant to Code § 9-6.14:19, suspended and set aside the commissioner's decision and remanded the matter to the commissioner with instructions to modify the "remedy to be imposed consistent with law."

On July 26, 2001, while the remand to the commissioner for a modification of the remedy was pending, Volkswagen noted an appeal to this Court, assigning error on several grounds to the circuit court's affirmance of the commissioner's ruling that Volkswagen had violated Code § 46.2-1569(7).  In its response, Miller assigned cross-error to the circuit court's determination that the commissioner exceeded his statutory authority in requiring Volkswagen to remedy its violation by modifying its vehicle allocation method.  Relying on Muse v. Virginia Alcoholic Beverage Control Board, 9 Va. App. 74, 78-79, 384 S.E.2d 110, 112-13 (1989), Miller argues the commissioner's imposition of such a remedy is necessarily inherent in the commissioner's express power to revoke a distributor's right to distribute vehicles in Virginia for a violation of Code § 46.2-1569(7).

Acting on the circuit court's remand, the commissioner issued a "Final Hearing Decision (On Remand)," dated November 13, 2001.[2]  In that decision, the commissioner concluded that the only remedy consistent with law that he could impose in this case was a declaration that Volkswagen had violated Code § 46.2-1569(7).  According to counsel, both Miller and Volkswagen appealed the commissioner's decision to the circuit court.  On

---

[2] Although not a part of our official record in this case, Volkswagen included this decision in its response to the commissioner's motion to dismiss.

- 8 -

February 1, 2002, the commissioner filed a motion in this Court to dismiss the instant appeal for lack of appellate jurisdiction.

## II. MOTION TO DISMISS

Initially, we address the commissioner's motion to dismiss this appeal. The commissioner contends the circuit court's June 29, 2001 "Final Decree and Order of Dismissal" appealed from by Volkswagen is not a "final" decision because the circuit court remanded the matter to the commissioner for modification of the remedy and because the commissioner's subsequent decision based on that remand is now back before the circuit court on appeal. Consequently, the commissioner argues, this Court lacks jurisdiction over these proceedings and should dismiss the appeal.

"The Court of Appeals of Virginia is a court of limited jurisdiction. Unless a statute confers jurisdiction in this Court, we are without power to review an appeal." Canova Elec. Contracting, Inc. v. LMI Ins. Co., 22 Va. App. 595, 600, 471 S.E.2d 827, 830 (1996) (citation omitted). Code § 17.1-405(1) grants us appellate jurisdiction over "[a]ny final decision of a circuit court on appeal from a decision of an administrative agency." Code § 17.1-405(4) grants us appellate jurisdiction over "[a]ny interlocutory decree or order entered in [such a case] granting, dissolving, or denying an injunction or . . . adjudicating the principles of a cause."

"A final decree is one '"which disposes of the whole subject, gives all the relief that is contemplated, and leaves nothing to be done by the court."'" Erikson v. Erikson, 19 Va. App. 389, 390, 451 S.E.2d 711, 712 (1994) (quoting Southwest

- 9 -

Virginia Hosps. v. Lipps, 193 Va. 191, 193, 68 S.E.2d 82, 83-84 (1951) (quoting Ryan v. McLeod, 73 Va. (32 Gratt.) 367, 376 (1879))). Here, the circuit court's June 29, 2001 "Final Decree and Order of Dismissal" does not meet this standard. In filing the complaint that commenced these proceedings, Miller sought a determination by the commissioner that Volkswagen's vehicle allocation system violated Code § 46.2-1569(7) and a remedy for that violation. The decree entered by the circuit court affirmed the commissioner's determination that Volkswagen's allocation methodology violated Code § 46.2-1569(7) but also held that the remedy imposed by the commissioner exceeded his statutory authority and remanded the matter to the commissioner for modification of the remedy. The circuit court's decree, therefore, is not a final decree "which disposes of the whole subject [and] gives all the relief that is contemplated."

Thus, the circuit court's decree is an interlocutory decree, but clearly not one that grants, dissolves, or denies an injunction. Hence, unless the circuit court's decree "adjudicates the principles of the cause," we lack jurisdiction to consider this appeal. Erikson, 19 Va. App. at 391, 451 S.E.2d at 712.

> In order to adjudicate the principles of a cause, a decree must decide an issue which "would of necessity affect the final order in the case." [Pinkard v. Pinkard, 12 Va. App. 848, 851, 407 S.E.2d 339, 341 (1991)]. The decree must "determine the rules by which the court will determine the rights of the parties." Id. It must "respond to the chief object of the suit . . . ." Id. at 852, 407 S.E.2d at 341-42 (emphasis added). However, "[t]he mere possibility" that an interlocutory decree "may affect the final decision in the trial does not necessitate an

immediate appeal." _Id._ at 853, 407 S.E.2d at 342.

_Polumbo v. Polumbo_, 13 Va. App. 306, 307, 411 S.E.2d 229, 229 (1991).

In this case, the circuit court's ruling affirming the commissioner's determination that Volkswagen's vehicle allocation methodology violated Code § 46.2-1569(7) would of necessity affect the final order in the case. Additionally, that affirmance responded to the chief object of the case and established the rules by which the rights of the parties would be determined. We find, therefore, that the circuit court's decree is an interlocutory decree that adjudicated the principles of the cause with regard to the issue of whether Volkswagen violated Code § 46.2-1569(7). Application of the same analysis with regard to the issue of the remedy that may be imposed, however, leads to the converse result. Consequently, we find that, because the circuit court remanded the issue of remedy to the commissioner for further resolution, its decree did not adjudicate the principles of the cause with regard to the remedy issue.

Hence, we conclude, on the particular circumstances of this case, that the circuit court's "Final Decree and Order of Dismissal" is an interlocutory decree subject to appellate review under Code § 17.1-405(4) as to the commissioner's determination that Volkswagen violated Code § 46.2-1569(7), but is neither an appealable final decree nor an appealable interlocutory decree as to the unresolved remaining issue of what remedy may be imposed by the commissioner. Accordingly, we deny the commissioner's

motion to dismiss this appeal for lack of jurisdiction as it relates to Volkswagen's breach of Code § 46.2-1569(7) and grant it as it relates to the remedy to be imposed for that breach.

We turn, therefore, to the merits of Volkswagen's appeal.

### III. STANDARD OF REVIEW

On appeal of an administrative agency's decision, "[t]he party complaining of an agency action has the burden of demonstrating an error of law subject to review." Hilliards v. Jackson, 28 Va. App. 475, 479, 506 S.E.2d 547, 549 (1998). The reviewing court must view the facts "in the light most favorable to the agency." Id. "The sole determination as to factual issues is whether substantial evidence exists in the agency record to support the agency's decision." Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 242, 369 S.E.2d 1, 7 (1988). In making that determination, "the reviewing court shall take due account of the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted." Id. "The reviewing court may reject the agency's findings of fact only if, considering the record as a whole, a reasonable mind necessarily would come to a different conclusion." Id.

With regard to an agency's decision on legal issues, the standard of review to be applied on appeal depends upon the nature of the legal question involved. Id. at 243, 369 S.E.2d at 8. "'"If the issue falls outside the area generally entrusted to the agency, and is one in which the courts have special competence, [e.g.], the common law or constitutional law,"' the

court need not defer to the agency's interpretation."  Chippenham & Johnston-Willis Hosps., Inc. v. Peterson, 36 Va. App. 469, 475, 553 S.E.2d 133, 136 (2001) (quoting Kenley, 6 Va. App. at 243-44, 369 S.E.2d at 8 (quoting Hi-Craft Clothing Co. v. NLRB, 660 F.2d 910, 914-15 (3d Cir. 1981))); see also Browning-Ferris Indus. v. Residents Involved in Saving the Env't, Inc., 254 Va. 278, 284, 492 S.E.2d 431, 434 (1997) (noting that, when reviewing issues "purely . . . of law, . . . we do not apply a presumption of official regularity or take account of the experience and specialized competence of the administrative agency").  Hence, where the issues to be reviewed on appeal involve, for example, the constitutionality of a statute, pure statutory interpretation, or the question of "whether an agency has . . . accorded constitutional rights, failed to comply with statutory authority, or failed to observe required procedures, less deference is required and the reviewing courts should not abdicate their judicial function and merely rubber-stamp an agency determination."  Kenley, 6 Va. App. at 243, 369 S.E.2d at 7-8.

"However, where the question involves an interpretation which is within the specialized competence of the agency and the agency has been entrusted with wide discretion by the General Assembly, the agency's decision is entitled to special weight in the courts."  Id. at 244, 369 S.E.2d at 8.  In such an instance, "'"judicial interference is permissible only for relief against the arbitrary or capricious action that constitutes a clear abuse of delegated discretion."'"  Id. (quoting Va. Alcoholic Beverage Control Comm'n v. York St. Inn, Inc., 220 Va. 310, 315, 257

S.E.2d 851, 855 (1979) (quoting <u>Schmidt v. Bd. of Adjustment</u>, 88 A.2d 607, 615-16 (N.J. 1952))).

IV.  VOID FOR VAGUENESS

Code § 46.2-1569(7) requires, in pertinent part, that a distributor

> ship monthly to any dealer, if ordered by the dealer, the number of new vehicles of each make, series, and model needed by the dealer to receive a percentage of total new vehicle sales of each make, series, and model equitably related to the total new vehicle production or importation currently being achieved nationally by each make, series, and model covered under the franchise.

Volkswagen contends the trial court, in affirming the commissioner's determination that Volkswagen violated Code § 46.2-1569(7), erred in ruling that Code § 46.2-1569(7) is not unconstitutionally vague.  Volkswagen maintains Code § 46.2-1569(7) is unconstitutionally vague because it fails to provide standards or guidance for determining how many new vehicles a distributor must ship to a particular dealer in order to achieve the number of new vehicles that is "equitably related to the total new vehicle production or importation currently being achieved nationally."  Volkswagen argues that, because the term "equitably" is not defined in the statute and provides no guidance as to what conduct is lawful or what is prohibited and effectively delegates sole authority to the commissioner to determine what number of new vehicles shipped to a dealer satisfies the statute, Code § 46.2-1569(7) is void for vagueness. We disagree.

"Every law enacted by the General Assembly carries a strong presumption of validity.  Unless a statute clearly violates a

provision of the United States or Virginia Constitutions, we will not invalidate it." City Council v. Newsome, 226 Va. 518, 523, 311 S.E.2d 761, 764 (1984). "The burden is on the challenger to prove the alleged constitutional defect." Perkins v. Commonwealth, 12 Va. App. 7, 14, 402 S.E.2d 229, 233 (1991).

We are guided in our consideration of this issue by Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489 (1982). In that case, the Supreme Court stated that "'[[v]agueness] challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand.'" Id. at 495 n.7. The Court further stated that laws must not only "'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly,'" but also "'provide explicit standards for those who apply them'" in order to prevent "'arbitrary and discriminatory enforcement.'" Id. at 498 (quoting Grayned v. City of Rockford, 408 U.S. 104, 108–09 (1972)). The Court added, however, that

> [t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe. . . .

> Finally, perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.

Id. at 498-99 (footnotes omitted).

Applying these standards for evaluating whether a statute is impermissibly vague to the present case, we find no merit in Volkswagen's vagueness argument. See also Fallon Florist v. City of Roanoke, 190 Va. 564, 590, 58 S.E.2d 316, 329 (1950) (holding that "a statute is not fatally indefinite because questions may arise as to its applicability, or opinions may differ with respect to what falls within its terms, or because it is difficult to enforce"). Code § 46.2-1569(7) regulates only economic conduct[3] and does not threaten any constitutionally protected rights. In addition, knowing it was immediately relevant to its allocation of newly manufactured vehicles, Volkswagen had the opportunity to consult the statute and clarify its meaning by inquiry. Moreover, the statute subjected Volkswagen solely to civil penalties in the event of a violation.

Thus, to sustain its void for vagueness challenge, Volkswagen had to show that Code § 46.2-1569(7) was vague, "'"not in the sense that it require[d] a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct [was] specified at all."'" Village of Hoffman Estates, 455 U.S. at 495 n.7 (quoting

_____

[3] Volkswagen concedes on appeal that Code § 46.2-1569(7) is an economic regulation.

Smith v. Goguen, 415 U.S. 566, 578 (1974) (quoting Coates v. City of Cincinnati, 402 U.S. 611, 614 (1971))).  Volkswagen, we conclude, failed to meet this burden.

Volkswagen knew, as a distributor of motor vehicles to dealers in Virginia, it was required under Code § 46.2-1569(7) to provide Miller with "the number of new vehicles . . . needed by the dealer to receive a percentage of total new vehicle sales . . . equitably related to the total new vehicle production or importation currently being achieved nationally."  As the circuit court stated in its letter opinion, the purpose of the statute is to ensure that dealers located in Virginia "get their fair share of cars, regardless of the [vehicle allocation] method[] a manufacturer [or distributor] chooses" to employ.  The language challenged—"equitably"—is in "everyday usage and is commonly understood."  Southern Ry. Co. v. Commonwealth, 205 Va. 114, 117, 135 S.E.2d 160, 164 (1964).  The term "equitably" means "in an equitable manner."  Webster's Third New International Dictionary 769 (1993).  "Equitable" means "fair to all concerned . . . : without prejudice, favor, or rigor entailing undue hardship."  Id.  Clearly, then, read naturally, Code § 46.2-1569(7) provided Volkswagen with notice that, in employing a vehicle allocation formula that inherently penalized small-volume dealers by preventing them, unlike larger-volume dealers, from acquiring vehicles in short supply, it was engaging in conduct that was not "fair to all concerned" and not "without prejudice" and, thus, was prohibited by the statute.

Furthermore, as the Supreme Court said in <u>Boyce Motor Lines, Inc. v. United States</u>, 342 U.S. 337, 340 (1952),

> few words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.

In that same vein, the Supreme Court has distinguished between those statutes that are impermissibly vague and those that simply provide a flexible standard by which conduct is to be judged. <u>See, e.g.</u>, <u>Grayned</u>, 408 U.S. at 110 (observing that the words of an anti-noise statute that was not impermissibly vague were marked by "flexibility and reasonable breadth, rather than meticulous specificity").

Guided by these principles, we conclude, on the circumstances of this case, that Code § 46.2-1569(7) specifies a standard of conduct that, while necessarily flexible, was sufficiently definite and clear to give Volkswagen fair warning that its conduct was unlawful. Accordingly, we affirm the circuit court's ruling that Code § 46.2-1569(7) is not unconstitutionally vague as applied to Volkswagen's conduct.

V. COMMERCE CLAUSE

Volkswagen contends the trial court, in affirming the commissioner's determination that Volkswagen violated Code § 46.2-1569(7), erred in ruling that Code § 46.2-1569(7) does not violate the Commerce Clause of the United States Constitution.

Volkswagen argues Code § 46.2-1569(7) violates the Commerce Clause because it impermissibly regulates interstate commerce. We disagree.

The Supreme Court "has adopted a two-tiered approach to analyzing state economic regulation under the Commerce Clause." Healy v. Beer Institute, 491 U.S. 324, 337 n.14 (1989).

> "When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits."

Id. (quoting Brown-Forman Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573, 579 (1986)).

In this case, Volkswagen does not argue that Code § 46.2-1569(7) discriminates against interstate commerce or that it favors in-state interests over out-of-state interests. Likewise, Volkswagen does not dispute that Code § 46.2-1569(7) regulates all distributors of motor vehicles evenhandedly or that the statute's asserted interest—to assure that the dealers in Virginia get their fair share of new vehicles—is legitimate. Rather, Volkswagen contends solely that Code § 46.2-1569(7) is per se invalid because it directly regulates interstate commerce.[4] Volkswagen argues that, by requiring distributors to

_____

[4] Accordingly, we need concern ourselves only with the first part of the first tier of the test set forth in Healy. Indeed, in its reply brief on appeal, Volkswagen chides the other

ship motor vehicles to its Virginia dealers in accordance with production or importation levels "being achieved nationally," Code § 46.2-1569(7) has the effect of forcing distributors "to apply an allocation methodology in all other states that comports with Virginia's standards."  This, Volkswagen maintains, constitutes direct regulation of interstate commerce, in violation of the Commerce Clause.

The Supreme Court set forth in Healy, 491 U.S. at 336-37, the governing principles for determining whether a statute has an impermissible extraterritorial effect, as follows:

> First, the "Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State[.]" Edgar v. MITE Corp., 457 U.S. 624, 642-43 (1982) (plurality opinion); see also Brown-Forman Distillers Corp., 476 U.S. at 581-83[.] . . .  Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature.  The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State. Brown-Forman Distillers Corp., 476 U.S. at 579.  Third, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation.  Generally speaking, the Commerce Clause protects against inconsistent

_____

parties for including in their appellate briefs sweeping Commerce Clause analyses that, in Volkswagen's opinion, focused too much on the inapposite aspects of Healy's two-tiered approach and too little on Volkswagen's single, narrow point of contention.

> legislation arising from the projection of
> one state regulatory regime into the
> jurisdiction of another State.  <u>Cf.</u> <u>CTS Corp.</u>
> <u>v. Dynamics Corp. of America</u>, 481 U.S. 69,
> 88–89 (1987).

The question before us, then, is whether Code § 46.2–1569(7) has the practical effect of controlling commercial activity wholly beyond Virginia's borders.  If so, it is <u>per</u> <u>se</u> invalid.  <u>See</u> <u>Cotto Waxo Co. v. Williams</u>, 46 F.3d 790, 793 (8th Cir. 1995) (holding that a state statute is <u>per</u> <u>se</u> invalid under the Commerce Clause when it has an extraterritorial effect, "that is, when the statute has the practical effect of controlling conduct beyond the boundaries of the state" (citing <u>Healy</u>, 491 U.S. at 336)).

For example, in <u>Brown-Forman Distillers Corp.</u>, the Supreme Court held that a New York statute requiring liquor distillers to affirm that their posted in-state prices for the coming month were no higher than the prices that would be charged for the same products in other states during the same month was <u>per</u> <u>se</u> invalid under the Commerce Clause.  476 U.S. at 582-84.  The Court found that the statute effectively controlled prices in other states because, once the prices had been posted in New York, a distiller could not lower its prices in any other state.  <u>Id.</u>

Similarly, in <u>Healy</u>, the Supreme Court struck down a Connecticut statute that required out-of-state beer shippers to affirm that the prices they charged in Connecticut were no higher than the lowest prices they charged for the same products in bordering states.  491 U.S. at 343.  The Court held the statute to be unconstitutional because it had the impermissible practical effect of "controlling commercial activity wholly outside of"

Connecticut.  Id. at 337.  The Court not only found that the statute controlled prices in neighboring states and interfered with the regulatory schemes in those states, but also observed that the enactment of similar legislation by several or all states would result in a "price gridlock."  Id. at 340.  Such regional or national regulation of commercial activity, the Court noted, is "reserved by the Commerce Clause to the Federal Government and may not be accomplished piecemeal through the extraterritorial reach of individual state statutes."  Id.

The principles set forth in Healy and Brown-Forman Distillers Corp. are not limited to price-affirmation statutes.  For instance, in NCAA v. Miller, 10 F.3d 633 (9th Cir. 1993), cert. denied, 511 U.S. 1033 (1994), the United States Court of Appeals for the Ninth Circuit held that a Nevada statute that required the NCAA to provide different "procedural due process protections" in Nevada enforcement proceedings than it provided in enforcement proceedings in other states violated the Commerce Clause per se because it directly regulated interstate commerce.  Id. at 640.  Noting that the NCAA required uniform enforcement procedures to operate effectively, the Ninth Circuit held that the practical effect of the Nevada statute was to require the NCAA "to apply Nevada's procedures to enforcement proceedings throughout the country."  Id. at 639.  "In this way," the court noted, the Nevada statute "could control the regulation of the integrity of a product in interstate commerce that occurs wholly outside Nevada's borders."  Id.  The court further observed that other states had and could enact legislation establishing rules for NCAA proceedings.  Id.  This, the court found, put the NCAA

"in jeopardy of being subjected to inconsistent legislation arising from the injection of Nevada's regulatory scheme into the jurisdiction of other states."  Id. at 640.

In this case, Volkswagen relies on Healy, Brown-Forman Distillers Corp., and NCAA to support its claim that Code § 46.2-1569(7) is per se invalid under the Commerce Clause because it has an impermissible extraterritorial effect.  In our view, however, the cases cited are inapposite to our consideration of the instant statute because, unlike the statutes under consideration in those cases, Code § 46.2-1569(7) does not have a direct practical effect on interstate commerce.

First, Code § 46.2-1569(7) does not have the practical effect of imposing direct controls on out-of-state commercial transactions, as did the price-control statutes in Brown-Forman Distillers Corp. and Healy.  Nothing in the statute ties the number of vehicles allocated to dealers in Virginia to the number of vehicles allocated to dealers in other states.  Nor does the statutue otherwise regulate the number of vehicles a distributor may allocate in any other state.  Moreover, the statute contains no directive, or even suggestion, that vehicle allocations in other states are to be conducted in accordance with Virginia's requirements.  Indeed, it references no other states and imposes no mandates or restrictions on them.

Likewise, Code § 46.2-1569(7) does not have the practical effect of directly interfering with regulatory procedures or schemes in other states, as did the statute in NCAA.  In essence, Code § 46.2-1569(7) merely requires that a distributor provide to a dealer in Virginia a number of new vehicles that is "equitably

related" to that distributor's national inventory and sales.  It places no restrictions, either expressly or by its practical effect, on how a distributor may allocate vehicles in other states.  Indeed, aside from requiring a just result, Code § 46.2-1569(7) mandates no particular procedures or schemes for allocating new vehicles in Virginia.  Thus, it cannot be said that the instant statute would force Volkswagen "to apply [Virginia's allocation] procedures . . . throughout the country." NCAA, 10 F.3d at 639.

Furthermore, despite Volkswagen's assertion to the contrary, the effect of similar statutes being enacted in other states would appear to be negligible.  Certainly, the passage of statutes that were truly similar to Code § 46.2-1569(7), in that they required a distributor's allocation of vehicles within the state to be "equitably" related to the distributor's national inventory and sales or simply to be "reasonable" or "fair," without mandating specific allocation requirements or procedures, would not result in distributors being subjected to inconsistent obligations to states, as in NCAA, or "price gridlock," as in Brown-Forman Distillers Corp. and Healy.  We find nothing in the record that convinces us otherwise.  Specifically, we find no evidence that the adverse effects on interstate commerce asserted by Volkswagen would occur if similar legislation were passed in other states.[5]

---

[5] This is not to say, of course, that all statutes regulating the allocation of vehicles would have, if passed in several or all states, as inconsequential an effect on interstate commerce as the instant statute would.  Indeed, we can imagine any number of possible allocation statutes whose cumulative effect on interstate commerce would, like the

Moreover, we are guided by the Supreme Court's rejection of a similar assertion in Exxon Corp. v. Maryland, 437 U.S. 117, 128-29 (1978).  In that case, the Court considered the validity of a Maryland statute prohibiting producers of petroleum from operating retail service stations within the state.  Id. at 119-20.  Exxon and the other oil companies involved in the suit argued, inter alia, that the cumulative effect of other states passing legislation similar to Maryland's law would have serious implications on their national operations.  Id. at 128.  The Court responded to the appellants' argument as follows:

> While this concern is a significant one, we do not find that the Commerce Clause, by its own force, pre-empts the field of retail gas marketing.  To be sure, "the Commerce Clause acts as a limitation upon state power even without congressional implementation."  Hunt v. Washington Apple Advertising Comm'n, 432 U.S. 333, 350 (1977).  But this Court has only rarely held that the Commerce Clause itself pre-empts an entire field from state regulation, and then only when a lack of national uniformity would impede the flow of interstate goods.  See Wabash, St. Louis & Pacific Ry. Co. v. Illinois, 118 U.S. 557 (1886); see also Cooley v. Board of Wardens, 53 U.S. 299, 319 (1851).  The evil that appellants perceive in this litigation is not that the several States will enact differing regulations, but rather that they will all conclude that divestiture provisions are warranted.  The problem thus is not one of national uniformity.  In the absence of a relevant congressional declaration of policy, or a showing of a specific discrimination against, or burdening of, interstate commerce, we cannot conclude that the States are without power to regulate in this area.

Id. at 128-29.

---

cumulative effects of the statues in NCAA, Brown-Forman Distillers Corp., and Healy, be problematic under the Commerce Clause.  That is not the case before us, however.

Here, we are aware of, and Volkswagen offers, no relevant congressional declaration of policy that persuades us the Commerce Clause preempts a state from regulating the allocation of motor vehicles to the dealers in that state, particularly where, as here, that regulation would have only a negligible effect on interstate commerce if adopted by other states.[6]  Nor has Volkswagen made a showing of a specific discrimination against, or burdening of, interstate commerce.

Thus, we conclude that Code § 46.2-1569(7) does not have the practical effect of controlling commercial activity wholly beyond Virginia's borders.  We hold, therefore, that Volkswagen's claim that the statute is per se invalid under the Commerce Clause because it directly regulates interstate commerce is without merit.  Accordingly, we affirm the circuit court's ruling that Code § 46.2-1569(7) does not violate the Commerce Clause of the United States Constitution.

## VI.  SCOPE OF COMMISSIONER'S AUTHORITY

[6] To the contrary, the congressional declaration of policy that most closely relates to Code § 46.2-1569(7) would seem to suggest otherwise.  In enacting the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221-25, in 1956, Congress clearly recognized the need for government to "redress the economic imbalance and unequal bargaining power between large automobile manufacturers and local dealerships, protecting dealers from unfair termination and other retaliatory and coercive practices." Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 92 (3d Cir. 2000).  The Act allows motor vehicle dealers to sue manufacturers or distributors with whom it has a franchise agreement for "failure to act in good faith in performing or complying with the franchise terms or in canceling, not renewing, or terminating the franchise."  15 U.S.C. § 1222.  "The Act, however, does not protect dealers against all unfair practices, but only against those breaches of good faith 'evidenced by acts of coercion or intimidation.'"  Northview Motors, Inc., 227 F.3d at 93 (quoting Salco Corp. v. General Motors Corp., 517 F.2d 567, 573 (10th Cir. 1975)).  Limited thus, the Act cannot be read as preempting the distribution of motor vehicles within a state from

Volkswagen contends the trial court, in affirming the commissioner's determination that Volkswagen violated Code § 46.2-1569(7), erred in ruling the commissioner did not exceed the scope of his authority in making that determination. Volkswagen maintains that, given Code § 46.2-1569(7)'s plain language, the determination of whether a distributor has violated the statute must be based, under the plain meaning rule of statutory construction, on the actual number of vehicles shipped by the distributor, rather than on the method of vehicle allocation used by the distributor.  In other words, Volkswagen

---

state regulation.

continues, Code § 46.2-1569(7) regulates solely "the actual shipment of motor vehicles by a distributor, [not] how the distributor decides to allocate vehicles."  Consequently, Volkswagen claims, the commissioner may consider and evaluate only the number of vehicles received by a dealer, not the program used to allocate those vehicles.  Hence, Volkswagen concludes, because the commissioner based his determination in this case on Volkswagen's vehicle allocation methodology rather than the specific numbers of vehicles Volkswagen allocated to Miller, he exceeded the scope of his statutory authority.  We disagree.

It would appear, at first glance, that Volkswagen's contention is correct.  The first sentence of Code § 46.2-1569(7) does indeed require that a distributor ship to a dealer "the number of new vehicles . . . needed by the dealer to receive a percentage of total new vehicle sales . . . equitably related to the total new vehicle production or importation currently being achieved nationally."  (Emphasis added.)  However, as the circuit court correctly pointed out, Volkswagen's argument fails to take into account the plain meaning of the language of Code § 46.2-1569(7) that immediately follows the sentence quoted above upon which Volkswagen relies.  The second sentence of Code § 46.2-1569(7) reads, "Upon the written request of any dealer holding its sales or sales and service franchise, the manufacturer or distributor shall disclose to the dealer in writing the basis upon which new motor vehicles are allocated, scheduled, and delivered to the dealers of the same line-make."  (Emphasis added.)  Plainly, the language "basis upon which new

motor vehicles are allocated" is intended to mean a distributor's method or system of vehicle allocation.

In construing a statute, we are guided by the following well established principles:

> While in the construction of statutes the constant endeavor of the courts is to ascertain and give effect to the intention of the legislature, that intention must be gathered from the words used, unless a literal construction would involve a manifest absurdity. Where the legislature has used words of a plain and definite import the courts cannot put upon them a construction which amounts to holding the legislature did not mean what it has actually expressed.

Floyd, Trustee v. Harding & als., 69 Va. (28 Gratt.) 401, 405 (1877). "If, in the application of these principles, the judiciary misconstrues legislative intent, the General Assembly can correct the error." Fairfax Hosp. Sys. v. Nevitt, 249 Va. 591, 597-98, 457 S.E.2d 10, 14 (1995).

Applying these principles to the matter at hand, we conclude that, taken together, the plain meaning of the first two sentences of Code § 46.2-1569(7) reflects the intention of the legislature to give the commissioner the flexibility necessary to accurately determine whether a dealer has received its fair share of vehicles from a distributor. Such flexibility, we believe, is in keeping with the statute's remedial purpose[7] and the commissioner's stated powers in this area,[8] and would allow the

---

[7] As previously noted, Code § 46.2-1569(7)'s purpose is to assure that the dealers in Virginia get their fair share of new vehicles.

[8] "The Commissioner shall promote the interest of the retail buyers of motor vehicles and endeavor to prevent unfair methods of competition and unfair or deceptive acts or practices." Code

commissioner to "deal with [the] untold and unforeseen variations in factual situations" that might present themselves.[9]  Boyce Motor Lines, Inc., 342 U.S. at 340.  We hold, therefore, that, in determining whether a distributor is in compliance with Code § 46.2-1569(7), the commissioner may consider and base his determination on that

---

§ 46.2-1501.  Clearly, ensuring the fair allocation of new vehicles to dealers in Virginia promotes the interest of new-car buyers in Virginia.  As we have previously held, "a state agency, 'in addition to its statutorily granted powers . . . has incidental powers which are reasonably implied as a necessary incident to its expressly granted powers for accomplishing [its] purposes." Jackson v. W., 14 Va. App. 391, 399, 419 S.E.2d 385, 390 (1992) (quoting Bader v. Norfolk Redev. & Hous. Auth., 10 Va. App. 697, 702, 396 S.E.2d 141, 144 (1990)).

[9] For example, such flexibility might be necessary in cases where, for whatever reason, accurate vehicle distribution data is unavailable and the commissioner must rely on the distributor's allocation formula to determine the number of vehicles allocated to a dealer.  It might also be required in a case such as this where the commissioner finds a distributor has apparently increased its allocation of vehicles to a dealer only after learning the dealer has filed a request for a hearing before the commissioner.  In such a case, the distributor's allocation methodology may be a more accurate reflection of whether the dealer truly received its fair share of vehicles.

distributor's vehicle allocation methodology.  Hence, contrary to Volkswagen's claim, the commissioner is not confined to examining only the actual number of vehicles allocated.

Here, the hearing officer, after receiving evidence from the parties, much of which focused on Volkswagen's vehicle allocation system, found that Volkswagen's allocation method did not comply with Code § 46.2-1569(7) because it was based on a mathematical formula that unfairly penalized small-volume dealers like Miller. The hearing officer further found that Volkswagen was unable to show that its practice of adjusting vehicle allocations based on customer satisfaction scores or its policy of allowing the area executive to override the allocation formula was adequate to counter the formula's inherent flaw.  Adopting the hearing officer's findings, the commissioner concluded that Volkswagen had violated Code § 46.2-1569(7).

Having concluded that, in determining whether a distributor has complied with Code § 46.2-1569(7), the commissioner may consider the distributor's method of allocation, we cannot say the commissioner exceeded the scope of his authority in this case, even though his determination that Volkswagen had violated Code § 46.2-1569(7) was based on Volkswagen's vehicle allocation methodology rather than the specific numbers of vehicles Volkswagen allocated to Miller.  Accordingly, we affirm the circuit court's ruling that the commissioner did not exceed the scope of his authority.

VII.  PROCEDURAL MATTERS AND BURDEN OF PROOF

Volkswagen contends the trial court, in affirming the commissioner's determination that Volkswagen violated Code

§ 46.2-1569(7), erred in rejecting Volkswagen's claims regarding three procedural errors alleged to have occurred before and during the formal evidentiary hearing conducted by the hearing officer. We hold that the trial court did not so err and briefly address each claim below.

### A. Failure to Conduct an Informal Hearing

Volkswagen contends the commissioner violated its due process rights when he failed to conduct an informal hearing or conference prior to the formal evidentiary hearing, as required by Code § 9-6.14:11 of the Virginia Administrative Process Act. Code § 9-6.14:11 provides that "agencies shall ascertain the fact basis for their decisions of cases through informal conference or consultation proceedings unless the named party and the agency consent to waive such a conference or proceeding to go directly to a formal hearing."

Assuming, without deciding, that the Virginia Administrative Process Act is applicable to proceedings arising under Code § 46.2-1569(7), as Volkswagen claims,[10] we hold that Volkswagen is barred from asserting this challenge on appeal because it was not preserved below.

As the circuit court observed, nothing in the record of this case indicates that Volkswagen requested such a hearing or raised an objection before the commissioner. "An appellant, under the provisions of the [Virginia Administrative Process Act], may not raise issues on appeal from an administrative agency to the

---

[10] The commissioner and Miller argue at length in their respective briefs that such proceedings are not subject to the Virginia Administrative Process Act. Given our decision in this matter, we need not decide that issue here.

circuit court that it did not submit to the agency for the agency's consideration." Pence Holdings, Inc. v. Auto Center, Inc., 19 Va. App. 703, 707, 454 S.E.2d 732, 734 (1995); see Rule 5A:18.

Thus, having failed to raise this issue before the commissioner, Volkswagen is precluded from raising it on appeal. Moreover, the record reflects no reason to invoke the good cause or ends of justice exceptions to Rule 5A:18.

### B. Lack of Notice

Volkswagen contends the hearing officer and, thus, the commissioner, violated its due process rights by (1) failing to provide notice of the factual or legal basis of the charges against it, (2) allowing Miller to alter the basis of its complaint after the hearing had commenced, and (3) changing his interpretation of Code § 46.2-1569(7) during the course of the evidentiary hearing. Volkswagen argues that, because of these procedural defects, it "was forced to defend itself with no notice of the claims which could be advanced." We disagree.

"'Due process is flexible and calls for such procedural protections as the particular situation demands.'" Duncan v. ABF Freight System, Inc., 20 Va. App. 418, 422, 457 S.E.2d 424, 426 (1995) (quoting Mathews v. Eldridge, 424 U.S. 319, 334 (1976)). "'[T]he fundamental requisite of due process of law is the opportunity to be heard.'" Id. at 423, 457 S.E.2d at 426 (quoting Goldberg v. Kelly, 397 U.S. 254, 267 (1970)).

> "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of

> the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance. But if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met, the constitutional requirements are satisfied."

Oak Hill Nursing Home, Inc. v. Back, 221 Va. 411, 417, 270 S.E.2d 723, 726 (1980) (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314-15 (1950) (citations omitted)).

Here, the hearing in this matter was convened at Miller's request pursuant to its complaint to the commissioner dated February 9, 1998, specifically alleging that Volkswagen had violated Code § 46.2-1569(7). The complaint, which was also sent to Volkswagen, referenced Volkswagen's allocation of vehicles on the basis of customer satisfaction surveys as being a violation of that statute and requested that Volkswagen disclose to the dealer the "basis upon which new vehicles [were] allocated." Following unsuccessful mediation, Miller notified the commissioner and Volkswagen, by letter dated April 2, 1998, that it had yet to receive a Passat or Beetle from Volkswagen and that Volkswagen would also need to disclose its "formula for allocation used since 1993."

On these facts, we conclude that Volkswagen was given notice that was "reasonably calculated, under all the circumstances, to apprise [Volkswagen] of the pendency of the action and afford [it] an opportunity to present [its] objections." We hold, therefore, that Volkswagen had adequate notice of the factual and legal basis of the charges against which it had to defend itself and was not denied its rights of due process with regard to

notice.  With regard to Volkswagen's other due process claims, we find no evidence in the record that Miller altered the basis of its complaint after the hearing had commenced or that the hearing officer changed his interpretation of Code § 46.2-1569(7) during the course of the hearing.  Accordingly, Volkswagen's due process challenge must fail.

C.  Misplacement of Burden of Proof

Volkswagen contends the hearing officer and, thus, the commissioner, erred by improperly placing the burden of proving compliance with Code § 46.2-1569(7) on Volkswagen.  We disagree.

Clearly, as indicated in his proposed decision, the hearing officer placed a "burden of proof" on Volkswagen.  That "burden," however, was not the burden, as Volkswagen characterizes it, of proving compliance with Code § 46.2-1569(7).  Rather, it was, as initially referred to by the hearing officer, the "opportunity to rebut" Miller's evidence, which established that the formula used by Volkswagen to allocate vehicles violated Code § 46.2-1569(7) because it unfairly penalized small-volume dealers.

After addressing the formula's inherent bias against small-volume dealers, the hearing officer turned his attention to the two programs purportedly implemented by Volkswagen to offset the formula's inequities.  Finding that Volkswagen's program allowing for the adjustment of vehicle allocations based on customer satisfaction survey scores only added to the adverse effect of the formula, the hearing officer concluded that Volkswagen "did not carry its burden of proof to show that utilization of [the customer satisfaction survey program] as a governor on the allocation system was fair and equitable."

Turning then to Volkswagen's other purportedly remedial program—assuring that each dealer had in stock at least one vehicle of every model (referred to as a "safety valve")—the hearing officer stated as follows:

> Nevertheless, even if this "safety valve" was shown to be an integral part of the allocation methodology, [Volkswagen] has not carried its burden to show that the change relying on this "safety valve" is adequate to remedy the allocation shortcomings. Specifically, there was insufficient evidence presented by [Volkswagen] to show that its allocation methodology was in compliance with [Code §] 46.2-1569(7) . . . ."

Volkswagen misapprehends the hearing officer's statements regarding Volkswagen's burden of proof. We find that, read in their proper context, the statements plainly indicate that the hearing officer, having determined that Volkswagen's core allocation formula did not comply with Code § 46.2-1569(7), gave Volkswagen the opportunity to show that its supplemental allocation programs cured the formula's defects. Finding Volkswagen's evidence and arguments lacking, the hearing officer concluded that Volkswagen did not carry its burden on rebuttal. Such a burden, we hold, was properly placed.

Moreover, the hearing officer pointed out in his decision that he conducted a pre-hearing telephone conference with counsel for the parties, during which the format of the hearing and the parties' respective burdens of proof were discussed. During that discussion, it was agreed that Volkswagen would be given the opportunity at the hearing "to rebut" following Miller's presentation of evidence and argument on the noncompliance of Volkswagen's allocation methodology. All counsel, the hearing

officer noted, agreed to the proposed format, and that format was followed at the hearing. Thus, having agreed to the format that was followed at the hearing, Volkswagen cannot now be heard to complain of such alleged defects in that proceeding. See <u>Manns v. Commonwealth</u>, 13 Va. App. 677, 680, 414 S.E.2d 613, 615 (1992) (holding that a party may not take advantage of an error it invited).

VIII. CONCLUSION

For these reasons, we affirm the circuit court's ruling that Volkswagen's method of allocating its newly manufactured motor vehicles to Miller violated Code § 46.2-1569(7). Accordingly, with respect to Volkswagen's appeal, we affirm the judgment of the circuit court.

Additionally, having granted the commissioner's motion to dismiss this appeal for lack of jurisdiction as to the unresolved issue of the remedy to be imposed, we dismiss Miller's cross-appeal.

<u>Affirmed in part,</u>
<u>dismissed in part.</u>

Benton, J., concurring.

I concur in the majority opinion; however, I write separately to state my understanding that Part VI of the majority opinion interprets Code § 46.2-1569(7) in a fashion that clearly renders it immune from an attack that it is unconstitutionally vague and violates the Commerce Clause.

Although, as the majority opinion notes, Code § 46.2-1569(7) facially suggests that a determination of "the number of new vehicles" drives the analysis, when read as a whole, the statute reflects a policy that a dealer is to receive a fair share of vehicles being produced or imported nationally by the manufacturer.  The statute provides as follows:

> Notwithstanding the terms of any franchise agreement, it shall be unlawful for any manufacturer, factory branch, distributor, or distributor branch, or any field representative, officer, agent, or their representatives:
>
>   \*    \*    \*    \*    \*    \*    \*
>
> 7.  To fail to ship monthly to any dealer, if ordered by the dealer, the number of new vehicles of each make, series, and model needed by the dealer to receive a percentage of total new vehicle sales of each make, series, and model equitably related to the total new vehicle production or importation currently being achieved nationally by each make, series, and model covered under the franchise.  Upon the written request of any dealer holding its sales or sales and service franchise, the manufacturer or distributor shall disclose to the dealer in writing the basis upon which new motor vehicles are allocated, scheduled, and delivered to the dealers of the same line-make.  In the event that allocation is at issue in a request for a hearing, the dealer may demand the

> Commissioner to direct that the manufacturer
> or distributor provide to the dealer, within
> thirty days of such demand, all records of
> sales and all records of distribution of all
> motor vehicles to the same line-make dealers
> who compete with the dealer requesting the
> hearing.

Code § 46.2-1569(7).

As I read the statute, it requires that the allocation of vehicles within Virginia be based on a methodology which considers new vehicle sales and equitably relates in some manner the dealer's percentage of those sales to the manufacturer's national production or importation. Thus, as the majority opinion "hold[s], . . . in determining whether a distributor is in compliance with Code § 46.2-1569(7), the commissioner may consider and base his determination on the distributor's vehicle allocation methodology." If that allocation methodology rationally takes into account new vehicle sales and results in a dealer receiving a fair share of new vehicles, the statutory mandate has been satisfied. This reading of the statute resolves what appears to me to be an ambiguity in connecting in a rational manner the various phrases in the statute.

The record establishes that Volkswagen's area executive often made allocations as frequently as each week and, thus, applied Miller's sales percentage factor to a smaller number of vehicles than would have been used if done monthly. The record supports the commissioner's finding that by making allocations as frequently as each week, Volkswagen's formula determined that the percentage of the pool of available new vehicles representing Miller's potential allocation was a "fractional vehicle" of less

than one.  Because those fractional values were rounded down and not cumulated, Miller "was effectively frozen out on a repeated basis from acquiring vehicles in short supply."  The commissioner also found that Volkswagen's allocation methodology was skewed by the use of a customer satisfaction program that impacted the vehicle allocation in a "punitive and inequitable" manner.  The commissioner further found that Volkswagen's decision to allow its area executive the discretion to override the allocation methodology to remedy these deficiencies was "a rule honored only when Miller requested [an administrative] hearing."  The record supports these findings and the commissioner's decision that Volkswagen's methodology of allocation failed to provide Miller with an equitable and fair number of those vehicles that were in short supply.

For these reasons, I concur in the majority opinion's holding and in the judgment.