COURT OF APPEALS OF VIRGINIA

Present:   Judges Elder, Frank and Clements
Argued at Richmond, Virginia


VOLKSWAGEN OF AMERICA, INC.

                                                    OPINION BY
v.        Record No. 2961-07-2        JUDGE JEAN HARRISON CLEMENTS
                                                    OCTOBER 28, 2008

DEMERST B. SMIT, COMMISSIONER OF THE
  VIRGINIA DEPARTMENT OF MOTOR VEHICLES
  AND MILLER AUTO SALES, INC.


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Melvin R. Hughes, Jr., Judge

Randall L. Oyler (James R. Vogler; Stephanie M. Zimdahl;
Douglas M. Palais; Brian L. Buniva; Corey B. Simpson; Stephen M.
Faraci, Sr.; Barack Ferrazzano Kirschbaum & Nagelberg LLP;
LeClair Ryan, on briefs), for appellant.

Eric K. G. Fiske, Senior Assistant Attorney General (Robert F.
McDonnell, Attorney General, on brief), for appellee Demerst B.
Smit, Commissioner of the Virginia Department of Motor
Vehicles.

Brad D. Weiss (Robert D. H. Floyd; Charapp & Weiss, LLP, on
brief), for appellee Miller Auto Sales, Inc.


This appeal arises from an order of the Circuit Court of the City of Richmond (circuit

court) affirming the decision by Demerst B. Smit, Commissioner of the Virginia Department of

Motor Vehicles (commissioner), that, during the period October 1997 through March 1998,

Volkswagen of America, Inc. (Volkswagen) violated Code § 46.2-1569(7) when it failed to ship

any newly introduced Passats or New Beetles to Miller Auto Sales, Inc. (Miller).  On appeal,

Volkswagen contends the circuit court erred in affirming the commissioner's decision because

(1) the commissioner failed to perform the requisite analysis under Code § 46.2-1569(7), (2) the

record contains no evidence to support the commissioner's decision, (3) the commissioner failed

to observe required procedures, (4) the statute violates the dormant Commerce Clause, and (5) the statute is unconstitutionally vague. For the reasons that follow, we affirm the circuit court's affirmance of the commissioner's decision.

## I. BACKGROUND

Volkswagen, a New Jersey corporation, imports a fixed number of vehicles from its German parent corporation and distributes them to its approximately 600 dealers in the United States, including its 17 dealers in Virginia. Miller is a Volkswagen dealer located in Winchester. In January 1998, Miller was the smallest dealer by volume in its assigned sales district.[1]

In late 1997 and early 1998, Volkswagen began importing a number of new models of vehicles, including the 1998 Passat and the New Beetle, both of which were in short supply.[2] Volkswagen used a national allocation methodology to distribute those new models to its dealers. That methodology was based on a "mathematical algorithm" designed to distribute vehicles in short supply where they were most likely to be sold and where they were most needed because of low inventory. Volkswagen then adjusted the algorithm results for each dealer based on the dealer's customer satisfaction survey scores. Dealers, like Miller, that generally failed to achieve a certain level of customer satisfaction scores had their algorithm results reduced and received fewer vehicles as a result. Volkswagen also permitted its "area executives," who were responsible for allocating the new vehicles to the individual dealers, to modify the algorithm results in response to local market conditions. Additionally, Volkswagen utilized a "minimum

---

[1] Miller sold 47 new Volkswagen vehicles in 1997. By comparison, the two largest dealers by volume in the same sales district, located in Springfield and Tysons Corner, respectively, both sold over 1,000 new Volkswagen vehicles in 1997.

[2] Although designated a 1998 model, the new, redesigned Passat was introduced in the fall of 1997. The New Beetle was introduced in February 1998. Both vehicles proved to be very popular, and Volkswagen's production of those vehicles could not keep up with the public's demand. Other older models of Volkswagen vehicles, including the earlier version of the Passat, were far less popular and widely available at the time.

stocking requirement," which allowed the area executives to override the algorithm results to ensure that each dealer had at least one vehicle of every Volkswagen model in its inventory.

In February 1998, Miller sent a letter to Volkswagen, with a copy to the commissioner, complaining that Volkswagen's allocation of vehicles to Miller violated Code § 46.2-1569(7).[3] Specifically, Miller asserted that "allocating Volkswagens based on Customer Satisfaction Index" was contrary to the statute. Miller also requested that Volkswagen give Miller "the number of new vehicles of each make, series, and model needed by the dealer to receive a percentage of total new vehicles production or importation currently being achieved nationally by each make, series, and model covered under the warranty."

---

[3] Code § 46.2-1569(7) provides:

> Notwithstanding the terms of any franchise agreement, it shall be unlawful for any manufacturer, factory branch, distributor, or distributor branch, or any field representative, officer, agent, or their representatives:
>
> \*          \*          \*          \*          \*          \*          \*
>
> To fail to ship monthly to any dealer, if ordered by the dealer, the number of new vehicles of each make, series, and model needed by the dealer to receive a percentage of total new vehicle sales of each make, series, and model equitably related to the total new vehicle production or importation currently being achieved nationally by each make, series, and model covered under the franchise. Upon the written request of any dealer holding its sales or sales and service franchise, the manufacturer or distributor shall disclose to the dealer in writing the basis upon which new motor vehicles are allocated, scheduled, and delivered to the dealers of the same line-make. In the event that allocation is at issue in a request for a hearing, the dealer may demand the Commissioner to direct that the manufacturer or distributor provide to the dealer, within thirty days of such demand, all records of sales and all records of distribution of all motor vehicles to the same line-make dealers who compete with the dealer requesting the hearing.

After a failed attempt by the parties at mediation, the hearing officer conducted an evidentiary hearing to determine whether Volkswagen failed to provide Miller with "an equitable number of vehicles in short supply." Based on the evidence presented by the parties, the hearing officer found that Volkswagen's vehicle allocation methodology in effect since October 1997 did not conform to the provisions of Code § 46.2-1569(7) because it unfairly penalized small-volume dealers like Miller. In reaching that decision, the hearing officer found that the algorithm Volkswagen used to allocate vehicles in short supply effectively prevented Miller from acquiring such vehicles because it "truncated fractional allocations" and "did not accumulate 'fractional vehicles.'" The hearing officer further found that the deficiencies in Volkswagen's algorithm were compounded by Volkswagen's use of customer satisfaction scores to adjust the algorithm results. That practice, the hearing officer found, inequitably punished Miller because "the restriction of allocations itself created a vicious cycle of lower [customer satisfaction] scores." The hearing officer also found that Volkswagen's "minimum stocking requirement" failed to overcome the inequities in the allocation methodology in this case, because it was applied only after Miller requested a hearing.

Adopting the hearing officer's findings, the commissioner concluded that the allocation methodology utilized by Volkswagen since October 1997 violated Code § 46.2-1569(7).

Volkswagen appealed to the circuit court, arguing that the commissioner erred in basing his determination whether Volkswagen was in compliance with Code § 46.2-1569(7) on the allocation methodology used by Volkswagen rather than on the actual number of vehicles Miller received from Volkswagen [Volkswagen allocated to Miller] in relation to the number of vehicles Volkswagen imported nationally. Volkswagen also argued that Code § 46.2-1569(7) is unconstitutionally vague and violates the Commerce Clause of the United States Constitution.

Rejecting Volkswagen's arguments, the circuit court affirmed the commissioner's decision that Volkswagen's vehicle allocation methodology violated Code § 46.2-1569(7).

On appeal to this Court, we affirmed the circuit court's judgment, holding that Code § 46.2-1569(7) was neither unconstitutionally vague nor in violation of the Commerce Clause and that the commissioner's determination that Volkswagen's vehicle allocation methodology violated Code § 46.2-1569(7) was consistent with the plain meaning of the statute and supported by the record. See Volkswagen of Am., Inc. v. Quillian, 39 Va. App. 35, 55, 62, 64-65, 69, 569 S.E.2d 744, 754, 757-58, 759, 761 (2002), reversed in part and vacated in part sub nom. Volkswagen of Am., Inc. v. Smit, 266 Va. 444, 454, 587 S.E.2d 526, 532 (2003).

The Supreme Court of Virginia awarded Volkswagen an appeal and, by opinion dated October 31, 2003, reversed this Court's judgment that the commissioner properly based his determination that Volkswagen violated Code § 46.2-1569(7) on Volkswagen's vehicle allocation methodology rather than the specific number of vehicles Volkswagen allocated to Miller. Volkswagen, 266 Va. at 454, 587 S.E.2d at 532. The Court held that the "plain and unambiguous" language of Code § 46.2-1569(7)

> required the [c]ommissioner to consider the actual monthly shipments that Volkswagen made to Miller in relation to the number of new vehicles imported by Volkswagen on a national level in the particular vehicle categories covered under Miller's franchise agreement. The statute further required that the [c]ommissioner, in conducting this examination, determine whether Miller obtained the number of such vehicles needed to receive a percentage of new vehicle sales "equitably related" to the number of these types of vehicles imported by Volkswagen nationally.

Id. at 452, 587 S.E.2d at 531.

The Supreme Court then concluded that the commissioner failed to undertake the required analysis:

> Instead of addressing the actual number of vehicles Miller received from Volkswagen in relation to national importation numbers, the [c]ommissioner merely examined the component parts of Volkswagen's vehicle allocation methodology, and adjustments made to that process, to determine whether they were "fair" in their application to small dealers such as Miller. Thus, in basing his determination on Volkswagen's vehicle allocation methodology, the [c]ommissioner wholly failed to consider the national importation numbers for the types of vehicles covered under Miller's franchise agreement. This omission was followed by the [c]ommissioner's failure to address whether Miller received the number of vehicles needed to receive a percentage of new vehicle sales "equitably related" to the quantity of these types of vehicles imported on a national level.

Id. at 453, 587 S.E.2d at 531. Hence, the Court ruled that the commissioner's "determination must be set aside." Id. at 453, 587 S.E.2d at 532.

The Supreme Court further ruled that, because its "conclusion regarding the [c]ommissioner's erroneous application of the statute decide[d] the merits of [the] appeal," it was unnecessary to "reach the constitutional issues raised by Volkswagen." Id. Accordingly, the Court vacated "that portion of [this Court's] judgment holding that Code § 46.2-1569(7) does not violate the Commerce Clause of the United States Constitution and is not unconstitutionally vague." Id.

Reiterating the need to focus "on the actual shipments to Miller, the relevant national importation figures, and whether there was an 'equitable' relationship between those numbers as mandated by the statute," rather than "on the business judgment of Volkswagen," the Supreme Court remanded the case to this Court "for ultimate remand to the [c]ommissioner for further proceedings consistent with the principles expressed in [the Supreme Court's] opinion." Id. at 454, 587 S.E.2d at 532.

By order dated April 20, 2004, this Court withdrew its earlier opinion and remanded the case to the circuit court for ultimate remand to the commissioner.

On remand to the commissioner, Volkswagen moved to have Miller's February 1998 complaint dismissed for failure to state a valid claim because it focused solely on Volkswagen's allocation methodology rather than the actual number of new vehicles Miller had received.[4] Volkswagen also argued that "Miller's initial protest may be moot" because it was based on an allocation method that was no longer used by Volkswagen. Concluding that the case was in the "same posture" as when Miller was granted the original hearing except they "now [had] a clear indication from the Supreme Court on what [the commissioner was] required to consider in order to make a determination whether Volkswagen [had] violated . . . Code § 46.2-1569(7)," the commissioner denied Volkswagen's motion to dismiss and directed that an evidentiary hearing be held.

The commissioner noted that, consistent with the Supreme Court's opinion and Code § 46.2-1569(7), the issue to be determined was "whether Miller obtained the number of vehicles needed to receive a percentage of new vehicle sales 'equitably related' to the quantity of these types of vehicles imported on a national level." Thus, the commissioner directed Volkswagen

> to provide the hearing officer and Miller with all relevant information and data which would delineate (i) Volkswagen's national importation numbers for the types of vehicles covered under Miller's franchise agreement for the time period in dispute, and (ii) the actual shipments received by Miller in relation to the

---

[4] In its motion to dismiss, Volkswagen described the Virginia Supreme Court's ruling as follows:

> In its October 31, 2003 decision, the Virginia Supreme Court, among other things, held that [Code § 46.2-1569(7)] does not authorize review of the allocation methodology adopted by a vehicle distributor. According to the Virginia Supreme Court, all that the [s]tatute authorizes the [c]ommissioner to review is the actual vehicle shipments to a dealer to determine if those actual shipments provide a dealer (here Miller) with a percentage of vehicles "equitably related" to the number of vehicles imported by the distributor nationally.

national importation numbers achieved by Volkswagen during this same time period.

When the hearing officer was appointed, Volkswagen requested that he "impos[e] some process by which Miller's claims [could] be identified and articulated prior to the hearing." Specifically, Volkswagen asked that "Miller be required to provide Volkswagen with either some form of amended complaint or 'bill of particulars' outlining the specifics of its complaint." After conducting a prehearing conference, the hearing officer noted that the parties agreed that "the period under consideration in this dispute [was] from 1993 through 1998" and that the issue to be heard was the same issue articulated by the Supreme Court and the commissioner, namely, "whether Miller . . . received the number of vehicles needed [to] receive[] a percentage of new vehicles equitably related to the number of vehicles imported by Volkswagen nationally." The hearing officer further noted that Volkswagen's request for more specifics of Miller's complaint was "an ingenuous irrelevancy" since the issue was clear. The hearing officer asked the parties to "suggest corrections to [his] findings as appropriate."

In response, Volkswagen stated that it did not agree that the period under consideration was 1993 through 1998. Instead, Volkswagen "continue[d] to take the position that," because Miller's complaint focused on a vehicle allocation methodology that Volkswagen did not employ until late 1997 and because the proof at the first hearing and the commissioner's initial decision related solely to that time period, "the relevant time period . . . [was] the period during which the [customer satisfaction]-based allocation process was in effect."

Volkswagen then filed with the commissioner a "Motion for Due Process Protections." Asserting its "due process right to know the charges against which it [was] being called upon to defend itself," Volkswagen asked the commissioner to dismiss the proceedings and require Miller to assert a new, valid complaint. Volkswagen argued that Miller's original February 1998 complaint, "by alleging only that [Volkswagen] was allocating vehicles in an improper manner[,

was] not enough to indicate a possible violation of [Code § 46.2-1569(7)], given the Supreme Court's October 31, 2003 ruling." It did not, Volkswagen further argued, articulate "how many vehicles Miller believe[d] it should have been shipped" or state "what models and series of additional vehicles [were] involved, what the relevant time period [was], or why additional vehicles should have been shipped." Alternatively, Volkswagen asked that, before the commencement of a formal evidentiary hearing, the commissioner conduct an "investigation into the bases of Miller's complaint" as required by Code § 46.2-1573(C), give Volkswagen any information in the commissioner's possession that could "be relied upon in making a decision adverse to Volkswagen," and provide Volkswagen with "formal notice of the legal and factual bases for the charges against it."

The case proceeded to an evidentiary hearing without apparent response from the commissioner to Volkswagen's motion.

At the hearing, Miller and Volkswagen stipulated that the transcripts and exhibits from the first evidentiary hearing were to be made a part of the record to avoid duplication. Miller presented additional evidence showing that, despite having ordered and requested delivery of such vehicles from Volkswagen, Miller received no 1998 Passats from Volkswagen during the six-month period from October 1997 through March 1998 and no New Beetles during the two-month period from February 1998 through March 1998. Miller's evidence further showed that, nationally, Volkswagen imported a total of 18,454 1998 Passats and 5,637 New Beetles during the same respective time periods for distribution to its approximately 600 dealers.[5] In presenting this evidence, Miller took no position on how many 1998 Passats and New Beetles

---

[5] Specifically, Volkswagen imported 2,016 Passats in October 1997; 2,996 Passats in November 1997; 4,835 Passats in December 1997; 1,270 Passats in January 1998; 3,655 Passats in February 1998; 3,682 Passats in March 1998; 1,424 New Beetles in February 1998; and 4,213 New Beetles in March 1998.

- 9 -

Volkswagen would have had to ship to Miller each month in order for those shipments to be deemed "equitably related" to Volkswagen's national importation figures. Instead, Miller argued that, in light of the significant number of 1998 Passats and New Beetles Volkswagen imported nationally from October 1997 through March 1998, Volkswagen's shipment to Miller of no such vehicles during those months was not equitably related to Volkswagen's national importation figures.

Volkswagen argued that its allocation of 1998 Passats and New Beetles to Miller was "equitable" because Miller's average "day supply" of those vehicles from March 1998 to December 1999 exceeded the national average.[6] However, Volkswagen's own evidence showed that it did not allocate any 1998 Passats to Miller from October 1997 through March 1998 or any New Beetles to Miller from February 1998 through March 1998. Thus, Miller's average "day supply" of 1998 Passats and New Beetles for those specific months was zero, and its percentage of the national "day supply" average was zero percent.

Volkswagen also presented evidence that it did not allocate any Passats to Miller in late 1997 and early 1998 because Miller had not yet acquired certain front-end alignment equipment necessary to repair the suspension system on the 1998 Passat.

After hearing the evidence presented, the hearing officer found that Volkswagen's admitted refusal to ship any 1998 Passats or New Beetles to Miller during the six-month period from October 1997 through March 1998 constituted a violation of Code § 46.2-1569(7).

Upon consideration of the record, the commissioner agreed with the hearing officer that Volkswagen violated Code § 46.2-1569(7) when it failed to ship any 1998 Passats to Miller from October 1997 through March 1998 and any New Beetles to Miller from February 1998 through

---

[6] Volkswagen defined "day supply" as a dealer's "available inventory" divided by the dealer's "average daily sales rate." According to Volkswagen, "[d]uring [a] new model release, day supply [was] determined by applying sales rates based on months with available sales."

March 1998. Those failures, the commissioner stated, "resulted in Miller not obtaining the number of [those] vehicles needed by Miller to receive a percentage of total new vehicle sales of each make, series, and model equitably related to the total new vehicle importations being achieved nationally by each make, series, and model."

In reaching that decision, the commissioner recognized that Miller did not present evidence regarding the number of 1998 Passats and New Beetles it would have needed to receive "in order to achieve a percentage of total new vehicle sales equitably related to the total new vehicle production or importations being achieved by Volkswagen nationally." Nevertheless, the commissioner concluded that "allocations of zero vehicles of a certain make, series, or model for one or more months would not be equitable." The commissioner reasoned that

> such an allocation would generally not satisfy the statutory requirement in months where, as in this case, the national importation numbers exceed[ed] the number of dealers nationally, and particularly where, as in this case, the vehicles are newly introduced makes, series or models. An allocation of zero vehicles, assuming a dealer has no such vehicles in inventory, translates to zero sales and zero sales, expressed as a percentage of new vehicle sales, would be zero percent. It is my opinion that shipping a number of vehicles that will enable a dealer to achieve or receive zero percent of the sales of a vehicle is generally not equitably related to national importation. . . .

> . . . Code § 46.2-1569(7) provides that it is unlawful for a manufacturer or distributor to "fail to ship monthly to any dealer, if ordered by the dealer[,]" the requisite number of vehicles specified by the statute. Based on the testimony in this case, it is undisputed that (i) Miller ordered and Volkswagen was aware of Miller's order for Passats during the months of October, November and December of 1997 and January, February and March of 1998 . . . and that Volkswagen declined to ship any Passats to Miller during those months. . . . It is also undisputed that Miller ordered and Volkswagen was aware of Miller's order for Beetles during the months of February and March of 1998 . . . and that Volkswagen failed to ship any Beetles to Miller during those months. . . . Further, during the relevant months, the national importations of the newly introduced Passats and Beetles exceeded the number of U.S. Volkswagen dealers and thus, there were sufficient numbers

of these vehicles to send every U.S. dealer more than zero vehicles: however, Miller received zero.

The commissioner also found Volkswagen's "day supply" analysis unpersuasive with respect to the relevant six-month period from October 1997 through March 1998 because it "failed to show that, for the newly introduced Beetles and Passats, Miller's day[] supply was equal to the national average for these specific vehicles." Moreover, the commissioner determined that, having been "admonished by the Supreme Court not to look at allocation formulas or methodologies" and instead "instructed to focus on the 'actual shipments to Miller, the relevant national importation figures, and whether there was an "equitable" relationship between those numbers,'" he could not properly

> accept the day[] analysis presented by [Volkswagen], in this case, since it did not focus on and did not evaluate whether zero shipments of newly introduced Passats and Beetles to Miller in the relevant months provided the dealer with the number of these vehicles needed by Miller to receive a percentage of total new vehicles sales of each make, series, and model equitably related to the total new vehicle importations being achieved nationally by each make, series, and model.

The commissioner further found that Miller's failure to acquire the new front-end alignment equipment for the 1998 Passat had no bearing on the issue whether Volkswagen violated Code § 46.2-1569(7) when it failed to allocate any such Passats to Miller during the relevant time period. Noting that "Code § 46.2-1569(7) provides no exception to the allocation requirements set forth therein," the commissioner concluded:

> It is clear from the record that the reason that Volkswagen declined to ship Miller Passat's [sic] for the months of November 1997, December 1997, January 1998 and February 1998 was because Miller had not obtained certain front-end alignment equipment required by Volkswagen. While Volkswagen may have had good reason for requiring a dealer to obtain alignment equipment for these vehicles, nothing in . . . Code § 46.2-1569(7) would authorize Volkswagen to withhold vehicles from a dealer for this reason.

(Citations omitted).

- 12 -

On appeal, the circuit court affirmed the commissioner's decision, rejecting Volkswagen's claims that the commissioner acted in an unlawful manner and that Code § 46.2-1569(7) violates the United States and Virginia Constitutions.

This appeal followed.

## II.  ANALYSIS

On appeal to this Court, Volkswagen asserts five arguments to support its contention that the circuit court erred in affirming the commissioner's decision that Volkswagen violated Code § 46.2-1569(7) when it failed to ship Miller any 1998 Passats or New Beetles from October 1997 through March 1998.  First, Volkswagen claims the commissioner failed to perform the analysis mandated by Code § 46.2-1569(7), as instructed by the Supreme Court in its October 31, 2003 opinion.  Second, Volkswagen asserts the administrative record contains insufficient evidence to support the commissioner's decision.  Additionally, Volkswagen contends the commissioner failed to follow fundamental procedural requirements.  Volkswagen further maintains that Code § 46.2-1569(7) violates the dormant Commerce Clause of the United States Constitution. Finally, Volkswagen posits that Code § 46.2-1569(7) violates the Due Process Clauses of the Virginia and United States Constitutions.  We disagree with each of Volkswagen's arguments.

## A.  Standard of Review

Judicial review of the commissioner's decision is governed by the Administrative Process Act, Code §§ 2.2-4000 to 2.2-4031.  See Code § 46.2-1573(A).  Accordingly, Volkswagen, as the party challenging the commissioner's decision, bears the burden "to demonstrate an error of law" with respect to the issues whether the commissioner accorded constitutional rights, complied with statutory authority, and observed required procedures, and whether substantial evidence supports the commissioner's decision.  Code § 2.2-4027.

"Under the 'substantial evidence' standard, the reviewing court may reject an agency's factual findings only when, on consideration of the entire record, a reasonable mind would *necessarily* reach a different conclusion." Alliance to Save the Mattaponi v. Commonwealth, 270 Va. 423, 441, 621 S.E.2d 78, 88 (2005). "In applying the substantial evidence standard, the reviewing court is required to take into account 'the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted.'" Id. at 442, 621 S.E.2d at 88 (quoting Code § 2.2-4027).

However, "'[i]f the issue falls outside the area generally entrusted to the agency, and is one in which the courts have special competence, i.e., the common law or constitutional law,' the court need not defer to the agency's interpretation." Chippenham & Johnston-Willis Hosps., Inc. v. Peterson, 36 Va. App. 469, 475, 553 S.E.2d 133, 136 (2001) (quoting Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 243-44, 369 S.E.2d 1, 8 (1988)); see also Browning-Ferris Indus. v. Residents Involved in Saving the Env't, Inc., 254 Va. 278, 284, 492 S.E.2d 431, 434 (1997) (noting that, when reviewing issues "purely . . . of law, . . . we do not apply a presumption of official regularity or take account of the experience and specialized competence of the administrative agency"). "Thus, where the legal issues require a determination by the reviewing court whether an agency has, for example, accorded constitutional rights, failed to comply with statutory authority, or failed to observe required procedures, less deference is required and the reviewing courts should not abdicate their judicial function and merely rubber-stamp an agency determination." Johnston-Willis, Ltd., 6 Va. App. at 243, 369 S.E.2d at 7-8.

In conducting its review, the court must view the facts "in the light most favorable to the agency." Hilliards v. Jackson, 28 Va. App. 475, 479, 506 S.E.2d 547, 549 (1998).

- 14 -

B. Propriety of the Commissioner's Analysis

Volkswagen contends the commissioner exceeded his statutory authority in finding that

Volkswagen violated Code § 46.2-1569(7) because the commissioner failed, in making that

finding, to perform the specific statutory analysis prescribed by the Supreme Court in its October

31, 2003 opinion. Volkswagen asserts the Supreme Court set forth in that opinion three specific

determinations the commissioner had to make in order to find the statute had been violated.

According to Volkswagen,

> [f]irst, the [c]ommissioner must determine, for a given month and
> for a given dealer, the percentage of total new vehicle sales of a
> vehicle by the dealer that is equitably related to the total national
> importation of that vehicle. Second, the [c]ommissioner must
> determine the number of vehicles that the dealer would need to
> have for it to receive such percentage of sales. Third, the
> [c]ommissioner must determine whether the dealer actually
> obtained from the distributor the number of shipments necessary to
> allow it to have such a number of vehicles.

Thus, Volkswagen argues, the commissioner could not "find a violation of the statute based

solely on evidence comparing shipments to national importations." Rather, Volkswagen's

argument continues, the commissioner had to expressly determine for a particular month what

specific number of vehicles the distributor was required to ship to the dealer to allow the dealer

to achieve a percentage of total new vehicle sales that was equitably related to the total new

vehicle importation of that vehicle being achieved nationally by the distributor. Hence,

Volkswagen further argues, the commissioner was required to expressly "find that Miller needed

to be shipped at least one vehicle before he could find that [Volkswagen] violated the statute by

shipping zero vehicles." Volkswagen concludes that the commissioner's failure to expressly

make that requisite finding constituted a rejection of the Supreme Court's interpretation of Code

§ 46.2-1569(7) and rendered the commissioner's analysis unlawful. We disagree.

In reversing this Court's prior decision in this case, the Supreme Court held that, in order to determine whether a violation of Code § 46.2-1569(7) has occurred, the commissioner must focus on the actual number of vehicles the distributor allocated to the dealer, rather than on the distributor's vehicle allocation methodology. Volkswagen, 266 Va. at 454, 587 S.E.2d at 532. Thus, the Court explained, the commissioner was required in this case "to consider the actual monthly shipments that Volkswagen made to Miller in relation to the number of new vehicles imported by Volkswagen on a national level in the particular vehicle categories covered under Miller's franchise agreement." Id. at 452, 587 S.E.2d at 531. The Court further explained that, "in conducting this examination, [the commissioner was required to] determine whether Miller obtained the number of such vehicles needed to receive a percentage of new vehicle sales 'equitably related' to the number of these types of vehicles imported by Volkswagen nationally." Id. Further explicating the commissioner's need to "address[] the actual number of vehicles Miller received from Volkswagen in relation to national importation numbers," the Court indicated that the requisite statutory analysis required the commissioner "to consider the national importation numbers for the types of vehicles covered under Miller's franchise agreement" and "to address whether Miller received the number of vehicles needed to receive a percentage of new vehicle sales 'equitably related' to the quantity of these types of vehicles imported on a national level." Id. at 453, 587 S.E.2d at 531. Finally, the Court explained that the focus of the requisite analysis must be "on the actual shipments to Miller, the relevant national importation figures, and whether there was an 'equitable' relationship between those numbers." Id. at 454, 587 S.E.2d at 532.

It is clear from the Supreme Court's analysis of Code § 46.2-1569(7) that the commissioner's decision in this case must be supported by three specific findings: (1) the number of 1998 Passats and New Beetles Miller actually received from Volkswagen during each

of the months at issue, (2) the number of 1998 Passats and New Beetles Volkswagen imported nationally during each of the same months, and (3) whether the number of 1998 Passats and New Beetles Miller actually received from Volkswagen during each of the months at issue permitted Miller to receive a percentage of new vehicle sales "equitably related" to the number of 1998 Passats and New Beetles Volkswagen imported nationally during each of the same months. Our review of the commissioner's written decision reveals the commissioner made each of these required findings.

First, the commissioner found that Miller did not receive any 1998 Passats or New Beetles from Volkswagen during the period between from October 1997 through March 1998 following the respective introductions of those vehicles:

> Based on the testimony in this case, it is undisputed that . . . Miller ordered and Volkswagen was aware of Miller's order for Passats during the months of October, November and December of 1997 and January, February and March of 1998 and that Volkswagen declined to ship any Passats to Miller during those months. It is also undisputed that Miller ordered and Volkswagen was aware of Miller's order for Beetles during the months of February and March of 1998[] and that Volkswagen failed to ship any Beetles to Miller during those months.

Second, the commissioner found that Volkswagen, which had "approximately 600 Volkswagen dealers in the U.S." at the time, imported 2,016 Passats in October 1997; 2,996 Passats in November 1997; 4,835 Passats in December 1997; 1,270 Passats in January 1998; 3,655 Passats in February 1998; 3,682 Passats in March 1998; 1,424 New Beetles in February 1998; and 4,213 New Beetles in March 1998.

Third, the commissioner found that Volkswagen's failure to ship any 1998 Passats to Miller during the months of October 1997 through March 1998 and any New Beetles during the months of February 1998 and March 1998 did not permit Miller to receive a percentage of new

vehicle sales equitably related to the number of 1998 Passats and New Beetles Volkswagen imported nationally during those same months:

> I conclude that Volkswagen's shipment of zero Passats and zero Beetles to Miller in these months, when it is clear that they were ordered by Miller, resulted in Miller not obtaining the number of these vehicles needed by Miller to receive a percentage of total new vehicle sales of each make, series, and model equitably related to the total new vehicle importations being achieved nationally by each make, series, and model.

The commissioner reasoned that, because Miller had not previously received from Volkswagen any of the newly introduced 1998 Passats or New Beetles, "[a]n allocation of zero vehicles [during the relevant months] translate[d] to zero sales and zero sales, expressed as a percentage of new vehicle sales, would be zero percent." The commissioner further reasoned that "shipping a number of vehicles that will enable a dealer to achieve or receive zero percent of the sales of a vehicle is generally not equitably related to national importation," particularly where, as here, "the national importations of the newly introduced Passats and Beetles exceeded the number of U.S. Volkswagen dealers and thus, there were sufficient numbers of these vehicles to send every U.S. dealer more than zero vehicles."

Based on these findings, the commissioner concluded that Volkswagen violated Code § 46.2-1569(7) when it failed to ship any 1998 Passats to Miller from October 1997 through March 1998 and any New Beetles to Miller from February 1998 through March 1998. Because, in reaching that decision, the commissioner focused on the actual number of vehicles the distributor allocated to the dealer, rather than on the distributor's vehicle allocation methodology, and made the three factual determinations required under Code § 46.2-1569(7), we conclude that the commissioner's analysis comported with the Supreme Court's analysis previously set forth in this case. See id. at 452-54, 587 S.E.2d at 531-32.

- 18 -

Indeed, notwithstanding Volkswagen's claim to the contrary, we find nothing in the Supreme Court's analysis that required the commissioner to expressly identify a particular number of 1998 Passats and New Beetles that Miller would have needed to receive during the relevant months in order to achieve a percentage of new vehicle sales equitably related to the number of 1998 Passats and New Beetles Volkswagen imported nationally during those months. While such an intermediate finding may, under some circumstances, assist the commissioner in making the third required finding, it is not, in itself, a required finding under the statute. Here, the evidence showed that Miller did not receive any 1998 Passats or New Beetles from Volkswagen during each of the relevant months. Hence, the sole question before the commissioner was whether Miller's receipt from Volkswagen of zero 1998 Passats and New Beetles permitted Miller to receive a percentage of new vehicle sales equitably related to the number of 1998 Passats and New Beetles Volkswagen imported nationally during the same months. Effectively finding that the receipt of some number of such vehicles greater than zero was required to permit Miller to achieve the requisite sales percentage, the commissioner found that Miller's receipt of no such vehicles was not enough to satisfy Code § 46.2-1569(7). Actual identification of the specific number of vehicles that Miller needed to receive to attain the required sales percentage was unnecessary under the plain terms of the statute.

Having determined that the commissioner performed the appropriate statutory analysis prescribed by the Supreme Court, we hold that the commissioner did not exceed his statutory authority in finding that Volkswagen violated Code § 46.2-1569(7). Accordingly, the circuit court did not err in affirming the commissioner's decision on that basis.

C.  Substantial Evidence

Volkswagen asserts the commissioner's finding that Volkswagen violated Code § 46.2-1569(7) is not supported by substantial evidence in the administrative record.  We disagree.

Volkswagen presents two related arguments to support its assertion that the record lacks sufficient evidence to support the commissioner's decision.  First and foremost, Volkswagen maintains the record lacks any evidence regarding "the critical factual finding required by . . . Code § 46.2-1569(7)," namely, the specific number of 1998 Passats and New Beetles that Miller would have needed to receive in each of the relevant months in order to achieve a percentage of new vehicle sales equitably related to the number of those vehicles imported nationally by Volkswagen during the same months.  This argument is inextricably intertwined with Volkswagen's prior claim that Code § 46.2-1569(7) required the commissioner, before finding Volkswagen violated the statute, to specifically determine how many 1998 Passats and New Beetles Volkswagen had to ship to Miller to allow Miller to receive a percentage of total new vehicle sales that was equitably related to Volkswagen's national importation of those vehicles.  Having previously concluded above that such a determination was not required under Code § 46.2-1569(7), we reject Volkswagen's argument that evidence to support such a determination must appear in the record.

Second, Volkswagen argues that the evidence in the record does not adequately support the commissioner's finding that Miller's sales percentage of zero during the relevant months when it received no 1998 Passats and New Beetles from Volkswagen was not equitably related to Volkswagen's national importation figures during the same months for those vehicles.  According to Volkswagen, Miller failed to show that "it actually was equitably entitled to make

some percentage of U.S. sales of those particular vehicles" during those months.  Volkswagen argues that,

> [g]iven Miller's historically small percentage of U.S. sales, given the very small number of Passats and Beetles actually being imported nationally by [Volkswagen] during those particular months, and given Miller's refusal to acquire necessary repair equipment that nearly every other dealer in the U.S. had purchased, . . . Miller was not equitably entitled to make any sales of Passats or Beetles during those months.

We find no merit in this argument.

For one thing, the record factually refutes Volkswagen's claim.  It is undisputed that, although the smallest dealer by volume in its assigned sales district, Miller was a functioning dealership that continued, throughout the relevant months at issue, to actively sell Volkswagen vehicles.  Miller, in fact, sold 47 new Volkswagen vehicles in 1997.  In other words, Miller was not a defunct dealership—its overall, ongoing percentage of total new vehicle sales was not zero.[7]  It is also undisputed that Volkswagen had approximately 600 dealers in the United States at the time, that Volkswagen imported 2,016 of the popular, newly introduced 1998 Passats in October 1997; 2,996 Passats in November 1997; 4,835 Passats in December 1997; 1,270 Passats in January 1998; 3,655 Passats in February 1998; and 3,682 Passats in March 1998, and that Volkswagen imported 1,424 of the popular, newly introduced New Beetles in February 1998 and 4,213 New Beetles in March 1998.  Thus, as the commissioner aptly noted, "the national importations of the newly introduced Passats and Beetles exceeded the number of U.S. Volkswagen dealers and thus, there were sufficient numbers of these vehicles to send every U.S. dealer more than zero vehicles."  Accordingly, we conclude that substantial evidence supports

---

[7] Obviously, Miller had no pertinent sales percentage at the time specifically related to the 1998 Passat and New Beetle since those vehicles had just recently been introduced in the United States and Miller had not yet received any from Volkswagen.

the commissioner's finding that Miller's sales percentage of zero for the 1998 Passat and New Beetle was not equitably related to Volkswagen's national importation figures for those vehicles.

Moreover, we agree with the commissioner's determination that Miller's failure to purchase certain repair equipment had no bearing on the analysis prescribed by the Supreme Court. As previously mentioned, the Court, in considering the "plain and unambiguous" language of Code § 46.2-1569(7), held that the commissioner erred in considering "the component parts of Volkswagen's vehicle allocation methodology, and adjustments made to that process." Id. at 453, 587 S.E.2d at 531. The Court further held that the statute required the commissioner to focus not "on the business judgment of Volkswagen" but "on the *actual shipments* to Miller, the relevant *national importation figures*, and whether there was an 'equitable' relationship *between those numbers*." Id. at 454, 587 S.E.2d at 532 (emphasis added). Given the Court's clear instruction to focus solely on the numbers themselves, rather than on the rationale or "business judgment" behind them, we conclude that Volkswagen's decision not to send any 1998 Passats or New Beetles to Miller because Miller had not yet obtained certain repair equipment was not a pertinent or even permissible consideration under the statutorily required analysis.

We hold, therefore, that, contrary to Volkswagen's claim, substantial evidence supports the commissioner's decision that Volkswagen violated Code § 46.2-1569(7). Thus, the circuit court did not err in affirming the commissioner's decision on that basis.

### D. Procedural Matters

Volkswagen contends the commissioner committed five "procedural errors" that required reversal of his decision that Volkswagen violated Code § 46.2-1569(7). Volkswagen alleges the

commissioner (1) failed to dismiss Miller's complaint for failure to state a valid claim,[8] (2) failed on remand to conduct an investigation into the merits of Miller's complaint, (3) failed to provide notice of the charges to be tried at the hearing, (4) wrongfully delegated prosecution of the case to Miller, and (5) issued a decision on charges not made prior to the hearing. Therefore, Volkswagen concludes, the circuit court erred in affirming the commissioner's decision. We hold that the circuit court did not so err and briefly address the alleged procedural errors below.

### 1. Failure to Dismiss the Complaint

Volkswagen contends the commissioner erred in denying its motion to dismiss Miller's February 1998 complaint for failure to state a valid claim. According to Volkswagen, Miller's complaint no longer stated a valid claim on remand because, in light of the Supreme Court's decision, it failed to indicate a possible violation of Code § 46.2-1569(7) and because the lone claim it stated was factually moot. We disagree.

Volkswagen argues that Miller's complaint failed to indicate a possible violation of Code § 46.2-1569(7) on remand because, in remanding the case to the commissioner, "[t]he Supreme Court ruled that the statute regulates vehicle shipments, not vehicle allocation methodologies." "Miller's complaint letter," Volkswagen's argument continues, "complained only about [Volkswagen's] vehicle allocation system, and, indeed, only about the customer satisfaction component of that system." Thus, Volkswagen concludes, "in light of the Supreme Court's decision, Miller's complaint did not state a valid claim or indicate a possible violation of the statute."

Volkswagen also argues that Miller's complaint was factually moot on remand because Volkswagen "had long since adopted a new allocation methodology, and had ceased including a

---

[8] While we disagree with Volkswagen's characterization of this alleged error as "procedural," we nevertheless include it in this portion of the opinion for consistency's sake.

- 23 -

customer satisfaction component in its allocation algorithm."[9]  Thus, Volkswagen concludes,

Miller's February 1998 complaint, "which objected to an abandoned allocation system, and,

specifically, to the customer satisfaction component of that system, no longer stated a justiciable

controversy."

Both of Volkswagen's arguments are premised on the assertion that Miller's 1998

complaint "complained *only* about [Volkswagen's] vehicle allocation system, and, indeed, *only*

about the customer satisfaction component of that system."  (Emphasis added).  That assertion,

however, is contradicted by the terms of the complaint.  While it is true that Miller's complaint

ostensibly focused on Volkswagen's allocation of vehicles "based on Customer Satisfaction

Index," it is also true that at the heart of the complaint was Miller's comprehensive allegation

that Volkswagen had violated Code § 46.2-1569(7) by failing to ship Miller "the number of new

vehicles of each make, series, and model needed by the dealer to receive a percentage of total

new vehicles [sales of each make, series, and model equitably related to the total new vehicle]

production or importation currently being achieved nationally by each make, series, and model

covered under the warranty."

It was that core allegation that gave rise to the commissioner's previous examination of

Volkswagen's entire allocation methodology—not just the customer satisfaction aspect of it—

and, ultimately, to the Supreme Court's instruction that the resolution of the instant complaint

under Code § 46.2-1569(7) turned not on Volkswagen's allocation methodology but on the

actual number of vehicles Volkswagen shipped to Miller.  At no point during the numerous

proceedings of this case did the commissioner or the courts find that the scope of Miller's 1998

complaint was limited solely to Volkswagen's use of customer satisfaction scores to allocate new

---

[9] The record indicates that Volkswagen abandoned it old allocation methodology in October 1999.

vehicles. Rather, the overriding issue throughout was whether, as Miller claimed in its 1998 complaint, Volkswagen's allocation of new vehicles to Miller failed to comply with the statute. And it was that same issue that remained valid and subject to examination and resolution on remand, in accordance with the Supreme Court's instruction.

Indeed, had the continuation of the case under the 1998 complaint been rendered invalid by the Supreme Court's decision or rendered factually moot by Volkswagen's revised allocation methodology, the Court could and likely would have ruled so and dismissed the case. See, e.g., Franklin v. Peers, 95 Va. 602, 602, 29 S.E. 321, 321 (1898) ("Whenever it appears or is made to appear that there is no actual controversy between the litigants, or that, if it once existed, it has ceased to do so, it is the duty of every judicial tribunal not to proceed to the formal determination of the apparent controversy, but to dismiss the case."). Instead, however, the Court remanded the case with instruction that the commissioner employ the analysis set forth in the Court's opinion to resolve Miller's claim that Volkswagen violated Code § 46.2-1569(7).[10] See Volkswagen, 266 Va. at 454, 587 S.E.2d at 532.

We conclude, therefore, that the valid claim made in Miller's 1998 complaint that Volkswagen violated Code § 46.2-1569(7) by failing to ship Miller the requisite number of vehicles remained unchanged by Volkswagen's revised allocation methodology and the Supreme Court's ruling. Accordingly, the complaint was not invalid or moot upon the continuation of this

---

[10] As Volkswagen points out in its appellate brief, the commissioner, on remand, did allude in his decision to the possibility that Miller's claim may be "moot," given that "the facts [that gave] rise to this issue [were] relatively stale in light of the fact that they occurred approximately seven to eight years ago." It is clear, however, that the commissioner, in using the term "moot" in the introductory portion of his decision, was noting his general concern about the age of the case and the parties' continuing desire "to pursue [the] matter" despite its age, rather than addressing the question of mootness raised by Volkswagen here. The commissioner's prior denial of Volkswagen's motion to dismiss Miller's complaint for failure to state a valid claim and his subsequent analysis and rulings in his final decision clearly manifest the commissioner's belief that Miller's complaint was not rendered moot by Volkswagen's revised allocation methodology or otherwise invalidated by the Supreme Court's decision in this case.

case on remand, and the commissioner did not err in refusing to dismiss the complaint for failure to state a valid claim.

## 2. Failure to Investigate Complaint

Volkswagen contends the commissioner "compounded his procedural error" by refusing to investigate the merits of Miller's complaint on remand, as required by Code § 46.2-1573(C). We disagree.

Code § 46.2-1573(C) provides that the commissioner "shall initiate investigations, conduct hearings, and determine the rights of parties under this article [(Code §§ 46.2-1566 to 46.2-1573.01)] whenever he is provided information by the Motor Vehicle Dealer Board or any other person indicating a possible violation of any provision of this article." According to Volkswagen, the statute requires the commissioner, upon receipt of an allegation of a statutory violation, "to conduct an independent investigation as to whether or not there is a legitimate basis to believe that an accused party actually has violated the law." The commissioner argues that the statute requires him, upon receipt of such an allegation, to merely investigate "whether there [is] a dispute between the parties." We need not decide which party is correct because, even if we assume, without deciding, that Volkswagen is correct that the commissioner is required, upon notification of a possible statutory violation, to investigate whether "there is a legitimate basis to believe that an accused party actually has violated the law," we nevertheless conclude that, under the circumstances of this case, no such investigation was required on remand.

As we indicated in the prior section above, this case arose upon Miller's 1998 complaint alleging that Volkswagen had violated Code § 46.2-1569(7) by failing to ship Miller the requisite number of vehicles. That complaint notified the commissioner of a possible statutory violation and served as the basis for the proceedings in this case. After mediation proved unsuccessful, the commissioner conducted an evidentiary hearing on Miller's complaint and concluded that

Volkswagen's allocation methodology had prevented Miller from acquiring a sufficient number of 1998 Passats and New Beetles to satisfy Code § 46.2-1569(7). On appeal, the Supreme Court rejected the analysis used by the commissioner and remanded the case so the commissioner could resolve the complaint using the correct legal standard. The case on remand was not a new, separate action. It was not based on a new allegation or any new information from Miller "indicating a possible [statutory] violation." Instead, it was a continuation of the same matter based on the same complaint. Thus, the commissioner's receipt of this case on remand did not constitute the receipt, under Code § 46.2-1573(C), of "information . . . indicating a possible [statutory] violation."

Moreover, in light of the prior proceedings in the case, the commissioner was already familiar on remand with the case and the merits of Miller's complaint. Thus, there was no need for the commissioner to conduct "an independent investigation as to whether or not there [was] a legitimate basis to believe that [Volkswagen] actually ha[d] violated the law." That basis already existed.

Because the remand of this case did not constitute the provision of new "information indicating a possible [statutory] violation" and because the commissioner already had a "legitimate basis to believe" that Volkswagen had violated Code § 46.2-1569(7), the commissioner was under no obligation to investigate the merits of Miller's complaint on remand. Thus, the commissioner did not err in refusing Volkswagen's request to do so.

### 3. Failure to Provide Notice of the Charges

Volkswagen also contends the commissioner erred on remand by failing to provide Volkswagen with "any notice of the factual and legal bases for the claims that would be presented at the formal evidentiary hearing." Volkswagen argues that "[s]uch notice would have had to advise

[Volkswagen], prior to the hearing, of the interpretation of the statute that would be applied by the [c]ommissioner." We find no merit to Volkswagen's contention.

On remand, both the commissioner and the hearing officer clearly indicated in letters to Miller and Volkswagen that the issue to be heard on remand was the issue set forth in the Supreme Court's October 31, 2003 opinion. Stating that they "now [had] a clear indication from the Supreme Court on what [the commissioner was] required to consider in order to make a determination whether Volkswagen [had] violated . . . Code § 46.2-1569(7)," the commissioner directed that a hearing "be held consistent with the principles expressed in the [Supreme Court's] [o]pinion." The commissioner further stated that "Miller and Volkswagen should be prepared to offer to the hearing officer relevant documentation and evidence to address the issue of whether Miller obtained the number of vehicles needed to receive a percentage of new vehicle sales 'equitably related' to the quantity of these types of vehicles imported on a national level." The commissioner specifically directed Volkswagen to provide

> all relevant information and data which would delineate
> (i) Volkswagen's national importation numbers for the types of
> vehicles covered under Miller's franchise agreement for the time
> period in dispute, and (ii) the actual shipments received by Miller
> in relation to the national importation numbers achieved by
> Volkswagen during this same time period.

Following the prehearing conference, the hearing officer identified the time period in dispute[11] and noted that the issue to be heard was the same issue articulated by the Supreme Court and the commissioner, namely, "whether Miller . . . received the number of vehicles

---

[11] To the extent that the hearing officer may have erred in identifying a time period that exceeded the time period addressed in the commissioner's decision following the first evidentiary hearing and implicitly referenced in the Supreme Court's October 31, 2003 opinion, we conclude that any such error was harmless since the six-month time period that served as the basis of Volkswagen's violation was well within the referenced time period.

needed [to] receive[] a percentage of new vehicles equitably related to the number of vehicles imported by Volkswagen nationally."

Given the factual and legal clarity of the issue set forth in the Supreme Court's October 31, 2003 opinion and the commissioner's and hearing officer's unmistakable reference to the same issue, we hold that Volkswagen had adequate notice of the claims that would be presented at the evidentiary hearing.

### 4. Delegation of Prosecution

Volkswagen contends the commissioner further erred on remand "by delegating to Miller full authority to prosecute the claim against [Volkswagen] at the hearing." Volkswagen argues that the commissioner may only "delegate his prosecutorial responsibilities to another executive agency, such as the Office of the Attorney General." We need not consider the merits of this issue, however, because Volkswagen failed to properly preserve the issue below.

Although Volkswagen raised the same argument on appeal to the circuit court, we find nothing in the record of this case that indicates that Volkswagen raised the issue before the commissioner. "An appellant, under the provisions of the [Administrative Process Act], may not raise issues on appeal from an administrative agency to the circuit court that it did not submit to the agency for the agency's consideration." Pence Holdings, Inc. v. Auto Center, Inc., 19 Va. App. 703, 707, 454 S.E.2d 732, 734 (1995), cited with approval in Doe v. Virginia Bd. of Dentistry, 52 Va. App. 166, 176, 662 S.E.2d 99, 104 (2008) (en banc).

Thus, having failed to raise this issue before the commissioner, Volkswagen is precluded from raising it on appeal. Accordingly, we will not consider the merits of Volkswagen's contention.

5. Charge against Volkswagen

Additionally, Volkswagen contends the commissioner erred on remand by finding Volkswagen guilty of a "charge that was not contained in any charging document." According to Volkswagen, Miller's 1998 complaint "continued to allege only that [Volkswagen] was operating an unlawful allocation system." It did not, Volkswagen further asserts, identify "any other charge against" Volkswagen. However, Volkswagen continues, the commissioner found that Volkswagen had violated Code § 46.2-1569(7) "not because of [Volkswagen's] allocation system, but because [Volkswagen] had failed to ship . . . certain vehicles to Miller during certain months." Thus, Volkswagen concludes, the commissioner "had no authority to make the specific finding that he did." We disagree.

As with its first claim of procedural error, Volkswagen's instant claim is based on the flawed premise that Miller's 1998 complaint complained only about Volkswagen's vehicle allocation system. Having previously concluded that Miller's complaint alleged that Volkswagen had violated Code § 46.2-1569(7) by failing to ship Miller the number of new vehicles required under the statute, we hold that Miller's complaint provided Volkswagen with adequate notice of the violation the commissioner found it to have committed.

Accordingly, the commissioner did not err in making that finding.

E. Dormant Commerce Clause

Volkswagen contends Code § 46.2-1569(7), as applied and on its face, violates the dormant Commerce Clause of the United States Constitution because it impermissibly regulates interstate commerce. We disagree.

The United States Supreme Court "has adopted a two-tiered approach to analyzing state economic regulation under the Commerce Clause." Healy v. Beer Institute, 491 U.S. 324, 337 n.14 (1989).

> "When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits."

Id. (quoting Brown-Forman Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573, 579 (1986)).

In this case, Volkswagen first argues that Code § 46.2-1569(7), on its face and as applied, is *per se* invalid because it directly regulates interstate commerce. Volkswagen maintains that, by requiring distributors to ship motor vehicles to its Virginia dealers in accordance with production or importation levels "being achieved nationally," Code § 46.2-1569(7) "unlawfully controls the number of vehicles that the distributor may import into the U.S. and, as a result, has the practical effect of controlling commerce outside of Virginia." Moreover, Volkswagen argues, if adopted by other states, the statute "would create the likelihood of a gridlock of competing state regulations." These effects, Volkswagen maintains, constitute direct regulation of interstate commerce, in violation of the Commerce Clause.

The Supreme Court set forth in Healy the governing principles for determining whether a statute has an impermissible extraterritorial effect, as follows:

> First, the "Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State[.]" Edgar v. MITE Corp., 457 U.S. 624, 642-43 (1982) (plurality opinion); see also Brown-Forman Distillers Corp., 476 U.S. at 581-83[.] . . . Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State. Brown-Forman Distillers Corp., 476 U.S. at 579. Third, the practical effect of the statute must be evaluated

> not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation. Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State. Cf. CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 88-89 (1987).

491 U.S. at 336-37.

The question before us, then, is whether Code § 46.2-1569(7), on its face or as applied, has the practical effect of controlling commercial activity wholly beyond Virginia's borders. If so, it is *per se* invalid. See Cotto Waxo Co. v. Williams, 46 F.3d 790, 793 (8th Cir. 1995) (holding that a state statute is *per se* invalid under the Commerce Clause when it has an extraterritorial effect, "that is, when the statute has the practical effect of controlling conduct beyond the boundaries of the state" (citing Healy, 491 U.S. at 336)).

For example, in Brown-Forman Distillers Corp., the United States Supreme Court held that a New York statute requiring liquor distillers to affirm that their posted in-state prices for the coming month were no higher than the prices that would be charged for the same products in other states during the same month was *per se* invalid under the Commerce Clause. 476 U.S. at 582-84. The Court found that the statute effectively controlled prices in other states because, once the prices had been posted in New York, a distiller could not lower its prices in any other state. Id.

Similarly, in Healy, the Supreme Court struck down a Connecticut statute that required out-of-state beer shippers to affirm that the prices they charged in Connecticut were no higher than the lowest prices they charged for the same products in bordering states. 491 U.S. at 343. The Court held the statute to be unconstitutional because it had the impermissible practical effect of "controlling commercial activity wholly outside of" Connecticut. Id. at 337. The Court not

only found that the statute controlled prices in neighboring states and interfered with the regulatory schemes in those states, but also observed that the enactment of similar legislation by several or all states would result in a "price gridlock." Id. at 340. Such regional or national regulation of commercial activity, the Court noted, is "reserved by the Commerce Clause to the Federal Government and may not be accomplished piecemeal through the extraterritorial reach of individual state statutes." Id.

The principles set forth in Healy and Brown-Forman Distillers Corp. are not limited to price-affirmation statutes. For instance, in NCAA v. Miller, 10 F.3d 633 (9th Cir. 1993), cert. denied, 511 U.S. 1033 (1994), the United States Court of Appeals for the Ninth Circuit held that a Nevada statute that required the NCAA to provide different "procedural due process protections" in Nevada enforcement proceedings than it provided in enforcement proceedings in other states violated the Commerce Clause *per se* because it directly regulated interstate commerce. Id. at 640. Noting that the NCAA required uniform enforcement procedures to operate effectively, the Ninth Circuit held that the practical effect of the Nevada statute was to require the NCAA "to apply Nevada's procedures to enforcement proceedings throughout the country." Id. at 639. "In this way," the court noted, the Nevada statute "could control the regulation of the integrity of a product in interstate commerce that occurs wholly outside Nevada's borders." Id. The court further observed that other states had and could enact legislation establishing rules for NCAA proceedings. Id. This, the court found, put the NCAA "in jeopardy of being subjected to inconsistent legislation arising from the injection of Nevada's regulatory scheme into the jurisdiction of other states." Id. at 640.

Here, however, unlike the statutes under consideration in Healy, Brown-Forman Distillers Corp., and NCAA, Code § 46.2-1569(7) does not have an impermissible extraterritorial effect, either on its face or as applied. For one thing, Code § 46.2-1569(7) does not have the

practical effect of imposing direct controls on out-of-state commercial transactions, as did the price-control statutes in <u>Brown-Forman Distillers Corp.</u> and <u>Healy</u>. Nothing in the statute, as applied or on its face, ties the number of vehicles allocated to dealers in Virginia to the number of vehicles allocated to dealers in other states. Nor does the statute otherwise regulate the number of vehicles a distributor may allocate in any other state. Moreover, the statute contains no directive, or even suggestion, that vehicle allocations in other states are to be conducted in accordance with Virginia's requirements. Indeed, it references no other states and imposes no mandates or restrictions on them.

Likewise, Code § 46.2-1569(7) does not have the practical effect, on its face or as applied, of directly interfering with regulatory procedures or schemes in other states, as did the statute in <u>NCAA</u>. In essence, Code § 46.2-1569(7) merely requires that a distributor provide to a dealer in Virginia a number of new vehicles that is "equitably related" to that distributor's national production or importation of new vehicles. It places no restrictions, either expressly or by its practical effect, on how a distributor may allocate new vehicles in other states. Indeed, aside from requiring an "equitable" relationship between the number of vehicles a distributor ships to a Virginia dealer and the number of vehicles the distributor produces or imports nationally, Code § 46.2-1569(7) mandates no particular procedures or schemes for allocating new vehicles in Virginia. Thus, it cannot be said that the instant statute would force Volkswagen "to apply [Virginia's allocation] procedures . . . throughout the country." <u>NCAA</u>, 10 F.3d at 639.

Furthermore, despite Volkswagen's assertion to the contrary, the effect of similar statutes being enacted in other states would appear to be negligible. Certainly, the passage of statutes that were truly similar to Code § 46.2-1569(7), in that they required a distributor's allocation of vehicles within the state to be "equitably related" to the distributor's national production or importation, without mandating specific allocation requirements or procedures, would not result

in distributors being subjected to inconsistent obligations to states, as in NCAA, or "gridlock," as

in Brown-Forman Distillers Corp. and Healy.  We find nothing in the language of the statute or

in the record to indicate that the adverse effects on interstate commerce asserted by Volkswagen

would occur if similar legislation were passed in other states.[12]

Moreover, we are guided by the Supreme Court's rejection of a similar assertion in

Exxon Corp. v. Maryland, 437 U.S. 117, 128-29 (1978).  In that case, the Court considered the

validity of a Maryland statute prohibiting producers of petroleum from operating retail service

stations within the state.  Id. at 119-20.  Exxon and the other oil companies involved in the suit

argued, *inter alia*, that the cumulative effect of other states passing legislation similar to

Maryland's law would have serious implications on their national operations.  Id. at 128.  The

Court responded to the appellants' argument as follows:

> While this concern is a significant one, we do not find that the
> Commerce Clause, by its own force, pre-empts the field of retail
> gas marketing.  To be sure, "the Commerce Clause acts as a
> limitation upon state power even without congressional
> implementation."  Hunt v. Washington Apple Advertising
> Comm'n, 432 U.S. 333, 350 (1977).  But this Court has only rarely
> held that the Commerce Clause itself pre-empts an entire field
> from state regulation, and then only when a lack of national
> uniformity would impede the flow of interstate goods.  See
> Wabash, St. Louis & Pacific Ry. Co. v. Illinois, 118 U.S. 557
> (1886); see also Cooley v. Board of Wardens, 53 U.S. 299, 319
> (1851).  The evil that appellants perceive in this litigation is not
> that the several States will enact differing regulations, but rather
> that they will all conclude that divestiture provisions are warranted.
> The problem thus is not one of national uniformity.  In the absence
> of a relevant congressional declaration of policy, or a showing of a
> specific discrimination against, or burdening of, interstate

---

[12] This is not to say, of course, that all statutes regulating the allocation of vehicles would have, if passed in several or all states, as inconsequential an effect on interstate commerce as the instant statute would.  Indeed, we can imagine any number of possible allocation statutes whose cumulative effect on interstate commerce would, like the cumulative effects of the statues in NCAA, Brown-Forman Distillers Corp., and Healy, be problematic under the Commerce Clause.  That is not the case before us, however.

> commerce, we cannot conclude that the States are without power to regulate in this area.

Id. at 128-29.

Here, we are aware of, and Volkswagen offers, no relevant congressional declaration of policy that persuades us the Commerce Clause pre-empts a state from regulating the allocation of motor vehicles to the dealers in that state, particularly where, as here, that regulation would have only a negligible effect on interstate commerce if adopted by other states.[13] Nor has Volkswagen made a showing of a specific discrimination against, or burdening of, interstate commerce.

Volkswagen also argues that Code § 46.2-1569(7), on its face and as applied, fails the second tier of the test used to analyze state regulations under the Commerce Clause because the statute's "burden on interstate commerce outweighs the local benefits." We disagree.

Once a court finds that a statute "regulates evenhandedly to effectuate a legitimate local public interest" and has only an indirect effect on interstate commerce, the court must examine whether "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970). The purpose of Code

---

[13] To the contrary, the congressional declaration of policy that most closely relates to Code § 46.2-1569(7) would seem to suggest otherwise. In enacting the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221-25, in 1956, Congress clearly recognized the need for government to "redress the economic imbalance and unequal bargaining power between large automobile manufacturers and local dealerships, protecting dealers from unfair termination and other retaliatory and coercive practices." Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 92 (3d Cir. 2000). The Act allows motor vehicle dealers to sue manufacturers or distributors with whom it has a franchise agreement for "failure to act in good faith in performing or complying with the franchise terms or in canceling, not renewing, or terminating the franchise." 15 U.S.C. § 1222. "The Act, however, does not protect dealers against all unfair practices, but only against those breaches of good faith 'evidenced by acts of coercion or intimidation.'" Northview Motors, Inc., 227 F.3d at 93 (quoting Salco Corp. v. General Motors Corp., 517 F.2d 567, 573 (10th Cir. 1975)). Indeed, as interpreted by the federal courts, the Act "plainly requires [a showing of] actual, or threatened, coercion or intimidation." Id. Limited thus, the Act cannot be read as pre-empting the distribution of motor vehicles within a state from state regulation that, like Code § 46.2-1569(7), requires no such showing.

§ 46.2-1569(7) is to ensure that motor vehicle dealers located in Virginia are able to obtain a fair share of vehicles from their national distributors for the benefit of Virginia's motor-vehicle-buying public. See Code § 46.2-1501 ("The [c]ommissioner shall promote the interest of the retail buyers of motor vehicles and endeavor to prevent unfair methods of competition and unfair or deceptive acts or practices."). Clearly, protecting Virginia's dealers against national distributors with more bargaining leverage and ensuring the fair allocation of new vehicles to dealers in Virginia greatly benefits Virginia's citizens. Thus, assuming *arguendo* that the statute has some incidental impact on interstate commerce, we hold that any such burden is not clearly excessive in relation to the putative local benefits.

Thus, we hold that Code § 46.2-1569(7) does not violate the Commerce Clause of the United States Constitution. Accordingly, the circuit court did not err in affirming the commissioner's decision on that basis.

F. Due Process Clauses

Volkswagen contends Code § 46.2-1569(7) violates the Due Process Clauses of the Virginia and United States Constitutions because it is unconstitutionally vague. We disagree.

"Every law enacted by the General Assembly carries a strong presumption of validity. Unless a statute clearly violates a provision of the United States or Virginia Constitutions, we will not invalidate it." City Council v. Newsome, 226 Va. 518, 523, 311 S.E.2d 761, 764 (1984). "The burden is on the challenger to prove the alleged constitutional defect." Perkins v. Commonwealth, 12 Va. App. 7, 14, 402 S.E.2d 229, 233 (1991). "Because the due process protections afforded under the Constitution of Virginia are co-extensive with those of the federal constitution, the same analysis will apply to both." Morrisette v. Commonwealth, 264 Va. 386, 394, 569 S.E.2d 47, 53 (2002).

Volkswagen maintains that Code § 46.2-1569(7) is unconstitutionally vague because it offers no standard of enforcement for the commissioner and fails to provide fair warning of what conduct is prohibited.  Specifically, Volkswagen maintains the statute fails to provide standards or guidance for determining how many new vehicles a distributor must ship to a particular dealer in order to achieve the number of new vehicles that is "equitably related to the total new vehicle production or importation currently being achieved nationally."  Because the term "equitably" is not defined in the statute and provides no guidance as to what conduct is lawful or what is prohibited and effectively delegates sole authority to the commissioner to determine what number of new vehicles shipped to a dealer satisfies the statute, Code § 46.2-1569(7) is void for vagueness, Volkswagen argues.

We are guided in our consideration of this issue by <u>Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.</u>, 455 U.S. 489 (1982).  In that case, the Supreme Court stated that "'[[v]agueness] challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand.'"  <u>Id.</u> at 495 n.7.  The Court further stated that laws must not only "'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly,'" but also "'provide explicit standards for those who apply them'" in order to prevent "'arbitrary and discriminatory enforcement.'"  <u>Id.</u> at 498 (quoting <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108-09 (1972)).  The Court added, however, that

> [t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement— depends in part on the nature of the enactment.  Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action.  Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.  The Court has also expressed greater

- 38 -

tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe. . . .

Finally, perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.

Id. at 498-99 (footnotes omitted).

Applying these standards for evaluating whether a statute is impermissibly vague to the present case, we find no merit in Volkswagen's vagueness argument. See also Fallon Florist v. City of Roanoke, 190 Va. 564, 590, 58 S.E.2d 316, 329 (1950) (holding that "a statute is not fatally indefinite because questions may arise as to its applicability, or opinions may differ with respect to what falls within its terms, or because it is difficult to enforce"). Code § 46.2-1569(7) regulates only economic conduct and does not threaten any constitutionally protected rights. In addition, knowing it was immediately relevant to its allocation of newly manufactured vehicles, Volkswagen had the opportunity to consult the statute and clarify its meaning by inquiry. Moreover, the statute subjected Volkswagen solely to civil penalties in the event of a violation.

Thus, to sustain its void for vagueness challenge, Volkswagen had to show that Code § 46.2-1569(7) was vague, """"not in the sense that it require[d] a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct [was] specified at all."""" Village of Hoffman Estates, 455 U.S. at 495 n.7 (quoting Smith v. Goguen, 415 U.S. 566, 578 (1974) (quoting Coates v. City of Cincinnati, 402 U.S. 611, 614 (1971))). Volkswagen, we conclude, failed to meet this burden.

Volkswagen knew, as a distributor of motor vehicles to dealers in Virginia, it was required under Code § 46.2-1569(7) to provide Miller with "the number of new vehicles . . . needed by the dealer to receive a percentage of total new vehicle sales . . . equitably related to the

total new vehicle production or importation currently being achieved nationally." As previously mentioned, the underlying purpose of the statute is to ensure that dealers located in Virginia get their fair share of new vehicles from their distributors. The language challenged—"equitably"—is in "everyday usage and is commonly understood." Southern Ry. Co. v. Commonwealth, 205 Va. 114, 117, 135 S.E.2d 160, 164 (1964). The term "equitably" means "in an equitable manner." Webster's Third New International Dictionary 769 (1993). "Equitable" means "fair to all concerned . . . : without prejudice, favor, or rigor entailing undue hardship." Id. Clearly, then, read naturally, Code § 46.2-1569(7) provided Volkswagen with notice that, in failing to allocate to Miller any of the very popular, newly introduced 1998 Passats and New Beetles from October 1997 through March 1998, despite having nationally imported and distributed to its other 600 or so dealers over 18,000 1998 Passats and over 5,000 New Beetles during that same period, it was engaging in conduct that was not "fair to all concerned" and not "without prejudice" and, thus, was prohibited by the statute.

Furthermore, as the Supreme Court said in Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 340 (1952),

> few words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.

In that same vein, the Supreme Court has distinguished between those statutes that are impermissibly vague and those that simply provide a flexible standard by which conduct is to be judged. See, e.g., Grayned, 408 U.S. at 110 (observing that the words of an anti-noise statute

- 40 -

that was not impermissibly vague were marked by "flexibility and reasonable breadth, rather than meticulous specificity").

Guided by these principles, we conclude, on the circumstances of this case, that Code § 46.2-1569(7) specifies a standard of conduct that, while necessarily flexible, was sufficiently definite and clear to provide an adequate standard of enforcement for the commissioner and give Volkswagen fair warning that its conduct was unlawful. Thus, we hold that Code § 46.2-1569(7) does not violate the Due Process Clauses of the United States and Virginia Constitutions. Accordingly, the circuit court did not err in affirming the commissioner's decision on that basis.

III. CONCLUSION

For these reasons, we affirm the circuit court's affirmance of the commissioner's decision that Volkswagen violated Code § 46.2-1569(7) when it failed to ship any newly introduced Passats to Miller from October 1997 through March 1998 and failed to ship any New Beetles to Miller from February 1998 through March 1998.[14]

Affirmed.

---

[14] Miller requests an award of attorney's fees and costs incurred in defending this appeal. Such matters, however, are strictly for the circuit court's consideration, not ours. See Code § 46.2-1573.01.